Stephen HARMON, Plaintiff,

v.

SAN DIEGO COUNTY (a public corporation); David K. Speer, Chief Administrative Officer of San Diego County; William D. Winterbourne, Director of the Department of Civil Service and Personnel for San Diego County; Joseph Stables, David G. Martinez, Veryl J. Mortenson, King O. Taylor, Timothy M. Considine, Members, San Diego County Civil Service Commission, Defendants.

Civ. No. 78–0167–GT.

United States District Court,
S. D. California.

Sept. 13, 1979.

Robert J. Loew, Los Angeles, Cal., for plaintiff.

Donald L. Clark, Lloyd M. Harmon, San Diego, Cal., for defendants.

## OPINION

GORDON THOMPSON, Jr., District Judge.

The plaintiff Harmon seeks relief under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e through 2000e–17 (1976) (the Civil Rights Act), under the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1976), under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976), and under the charter for San Diego County. The plaintiff claims that the County denied him a job on the basis of race and sex.[1] Because the court finds that Harmon is entitled to relief under Title VII, it does not reach alternative statutory and constitutional claims proposed by Harmon.

## FINDINGS OF FACT

Harmon is a white male. The defendant San Diego County, a public corporation organized under the laws and constitution of California, is an employer within the mean-

---

1. The complaint also states a claim under 31 U.S.C. § 1244 (1976), but the plaintiff has not pursued that request at any point in this litigation.

ing of the Civil Rights Act § 2(b), 42 U.S.C. § 2000e(b) (1976). At all relevant times, defendant Speer was Chief Administrative Officer of the County. In that capacity, he was responsible for the supervision and control of those County affairs placed in his charge by the County Board of Supervisors. Defendant Winterbourne was the duly appointed Director of Personnel for San Diego County. In that capacity he was the general manager of the San Diego County Department of Civil Service and was responsible for the recruitment and examination of applicants to the Civil Service, for the classification of positions, and for other decisions on personnel. The defendants Stables, Martinez, Mortenson, Taylor, and Considine were duly appointed members of the San Diego County Civil Service Commission. They were responsible for the direction and approval of actions taken by the Director of Personnel, and they had the authority to prescribe, amend, and enforce rules for the employment of people in the classified service of San Diego County. At all relevant times, the individual defendants were operating in their respective capacities as employees of San Diego County. The individual defendants are employers within the meaning of the Civil Rights Act § 2(b), 42 U.S.C. § 2000e(b), and there is no dispute that San Diego County is liable for all acts of the individual defendants done in their respective capacities. *See Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir. 1979). Consequently, all defendants will be referred to as "the County."

Pursuant to the authority granted by the Constitution of the State of California, the County adopted a charter in 1933 for the purpose of local self-government. The County's charter created a Department of Civil Service and Personnel, administered by the Civil Service Commission of San Diego County, to govern the Civil Service System. County Charter § 76. The Civil Service System is divided into the classified and unclassified services. County Charter § 78. The charter requires the Civil Service Commission to make rules for "the preparation and holding of promotional and open competitive examination." The purpose of these rules is "to test the relative fitness of all applicants for appointments to the Classified Civil Service, and to create eligible lists of all successful candidates in the order of their standing." County Charter § 79(b). The Civil Service Commission must also make rules for temporary appointments when there is no eligible list from which a position can be filled. County Charter § 79(c).

The Civil Service Commission has promulgated the rules required by the County Charter. *See* Civ.Serv.R. III; R. IV, § 4.7(c). When a position with the classified service becomes vacant, the Department of Civil Service and Personnel must provide an eligibility list of candidates to the departmental head for whom the selected individual will ultimately work (the appointing authority). In creating the eligibility list, the Department of Personnel consults with the appointing authority to establish the skills and knowledge required for the position. An examination is then constructed to measure the applicants' relative skills and abilities to perform the job. Only applicants with the necessary qualifications to perform the job are put on the eligibility list. Selection for hire is made from that list.

The Civil Service rules provide that, in rating experience in any examination, "no more consideration shall be given to the experience which any applicant may have obtained while holding a provisional appointment to any position in the classified service, than is allowed to persons who have had equally valuable experience in some like employment elsewhere." Civ.Serv.R. III, § 3.4. The rules state that a provisional appointment may be made to a position in the classified service if there is no candidate available from the appropriate eligibility list. In no event may such an appointment continue longer than six months without the prior written approval of the Director of Personnel. Civ.Serv.R. IV, § 4.7(c).

The County has a Department of Medical Institutions. This Department is responsible for the administration of Edgemoor Geriatric Hospital, a long-term skilled nurs-

ing care facility for primarily geriatric patients. W. W. Stadel, M.D., a white male, is Director of the Department of Medical Institutions. He is responsible for the administrative supervision and control of Edgemoor, including the appointment of an Associate Administrator to act as the hospital's on-site administrator. The position of Associate Administrator is in the classified service of San Diego County.

In the fall of 1976, the position of Associate Administrator for the Edgemoor facility became vacant. At that time, there was no eligibility list for this position. In late October, 1976, Stadel contacted Harmon and asked Harmon if he would be interested in a provisional appointment to the vacant position at Edgemoor. Harmon had a current valid California Nursing Home Administrator's license, which Stadel believed to be a statutory requirement of anyone assuming the job of Associate Administrator. *See* Cal.Bus. & Prof.Code § 3905 (West 1974). Stadel did not promise Harmon that he, Harmon, would be appointed permanently.

Harmon expressed interest in the job and was appointed provisionally on November 13, 1976.

As required by Civil Service Rules, the Department of Personnel constructed an examination for the post of Associate Administrator. This examination had a range of possible scores from zero to 100. On April 15, 1977, Harmon took the examination, which consisted of an oral interview before a two-person board. The results of the examination placed Harmon in the number one position of eligibility.

Civil Service rules require the Personnel Department to send the appointing authority a list of the three candidates with the highest ranking on the eligibility list, plus all others who are within two percentage points of the third person. *See* County Charter § 80; Civ.Serv.R. IV, § 4.2. This procedure is called the Rule of Three Plus Two Percent. The applicants for Associate Administrator at Edgemoor Hospital who fit within this rule were as follows:

| Name | Grade | Race/National Origin | Sex |
|---|---|---|---|
| Stephen Harmon | 98.50 | Caucasian | Male |
| Oscar Quinney | 96.00 | Black | Male |
| Ray Allford | 94.50 | Caucasian | Male |
| Robert M. Cohn | 93.50 | Caucasian | Male |
| Dennis L. Karnowski | 93.50 | Caucasian | Male |
| Francoise Euliss | 92.50 | Caucasian | Female |
| George Ramirez | 92.50 | Mexican-American | Male |

On May 6, 1977, the Personnel Department certified the following list of candidates to Stadel:

| Name | Grade | Race/National Origin | Sex |
|---|---|---|---|
| Stephen Harmon | 98.50 | Caucasian | Male |
| Oscar Quinney | 96.00 | Black | Male |
| Ray Allford | 94.50 | Caucasian | Male |

Stadel interviewed all three candidates between May 6, 1977, and May 11, 1977. Each candidate was given the opportunity to present additional information regarding his qualifications. After the interviews, Stadel rejected Allford as unqualified, because Allford did not have the requisite California Nursing Home Administrator's license. Both Harmon and Quinney were qualified to fill the position of Associate Administrator. In Dr. Stadel's opinion, however, Harmon was better-qualified than Quinney.

On May 6, 1977, a Consent Decree was filed in the case of *United States v. San Diego County*, Civ. No. 76–1094–S (S.D. Cal.). The Consent Decree was entered on May 9, 1977. Harmon was not a party to this decree, nor did any of the parties to the decree ever represent Harmon's interests. Even though Harmon twice tried to intervene in that litigation, the County successfully opposed both efforts. *See* Motion for Leave to Intervene as Plaintiff, *United States v. San Diego County*, Civ. No. 76–1094–S (S.D.Cal. filed July 22, 1977); Response and Opposition to Motion to Intervene, *id.* (filed July 29, 1977); Findings of Fact and Conclusions of Law Denying Intervention, *id.* (filed Sept. 1, 1977); Motion to Intervene, *id.* (filed Feb. 16, 1978); Response and Opposition to Motion to Intervene, *id.* (filed Feb. 27, 1978); Order Denying Petition for Intervention, *id.* (filed March 20, 1978).

After interviewing all three candidates but before making any appointment, Stadel talked with the County Counsel. The County Counsel told Stadel that, under the terms of the Consent Decree, Stadel had to appoint Quinney as Associate Administrator, because Quinney was black and Harmon was white. Stadel believed that he was legally bound by the Consent Decree to appoint a qualified black instead of a better-qualified white. But for Stadel's understanding of the Consent Decree, he would have appointed Harmon as Associate Administrator. On May 11, 1977, Stadel offered the position to Quinney.

On May 12, June 3, and June 27, 1977, the Director of Personnel approved extensions of Harmon's provisional appointment as Associate Administrator. Quinney agreed to report to work on June 20, 1977. On June 16, 1977, Quinney waived appointment for medical reasons. Stadel told Harmon that Stadel would make Harmon's provisional appointment permanent. Between June 17, 1977, and June 20, 1977, however, County Counsel told Stadel that the Consent Decree required Stadel to get from the Personnel Department another list of candidates designating the candidates' race and sex. On or about June 20, 1977, the Personnel Department certified to Stadel the names of candidates from whom a selection was to be made. This list was derived from the original examination given for the position of Associate Administrator. The list was as follows:

| Name | Grade | Race/National Origin | Sex |
| --- | --- | --- | --- |
| Stephen Harmon | 98.50 | Caucasian | Male |
| Robert M. Cohn | 93.50 | Caucasian | Male |
| Dennis L. Karnowski | 93.50 | Caucasian | Male |
| Francoise Euliss | 92.50 | Caucasian | Female |
| George Ramirez | 92.50 | Mexican-American | Male |

But for Stadel's understanding of the Consent Decree, he would not have asked for another list of candidates.

Only Harmon, Cohn, and Euliss asked for and received interviews. After these interviews, Stadel decided that Harmon was the best-qualified of the three candidates. Harmon was better-qualified than Euliss, because Euliss's prior experience came in a facility dealing with children, while Edgemoor was larger and cared for the elderly. Defendant Spear, however, told Stadel that the Consent Decree required Stadel to appoint a female candidate over a male candidate. Stadel believed that the Consent Decree required him to appoint a qualified female instead of a better-qualified male. But for Stadel's understanding of the Consent Decree, he would have appointed Harmon as Associate Administrator. On July 25, 1977, the position of Associate Administrator was offered to and accepted by Euliss. Euliss is still Associate Administrator at Edgemoor.

After leaving the Edgemoor post on July 22, 1977, Harmon continued to work for the County until May 28, 1978, when he took a job in the private sector. He exhausted his administrative remedies and obtained a Right-to-Sue letter from the federal government before the timely filing of this lawsuit.

In the event that any of the foregoing Findings of Fact actually constitute conclusions of law, they are to be considered conclusions of law.

## CONCLUSIONS OF LAW

*A. Jurisdiction and Venue.* Jurisdiction over Harmon's Title VII claim is conferred by 42 U.S.C. § 2000e–5 (1976) and by 28 U.S.C. §§ 1331 and 1343(3) (1976). Venue is proper under 28 U.S.C. § 1391 (1976) and 42 U.S.C. § 2000e–5(f) (1976).

*B. Title VII Prima Facie Case.* Harmon contends that the County's refusal to hire him on May 11, 1977, and on June 20, 1977, constituted violations of Title VII.[2]

A three-part inquiry is required to decide whether Title VII has been violated. The first question is whether plaintiffs have established a prima facie case of employment discrimination. If a prima facie case has been shown, the burden then shifts to the employer to justify the employment practice in question. If the employer meets his burden of justification, plaintiffs may then show that alternative selection devices exist that would serve the employer's legitimate interests without discriminatory effects.

*Blake v. City of Los Angeles,* 595 F.2d 1367, 1372 (9th Cir. 1979) (citations omitted).

A Title VII plaintiff establishes a prima facie case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citations omitted). At a minimum, the plaintiff must demonstrate

that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

*Teamsters v. United States,* 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

Harmon has met this burden with regard to both refusals to hire. In May,

---

2. (a) It shall be an unlawful employment practice for an employer—
    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
    (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Civil Rights Act § 703, 42 U.S.C. § 2000e–2 (1976).

The Supreme Court has recognized two distinct kinds of violations of Title VII. In disparate treatment cases, such as this one, the employer treats some people less favorably than others simply because of their race, color, religion, sex, or national origin. Discriminatory intent is critical, although it can in some situations be inferred from the mere fact of differences in treatment. *See Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonald v. Santa Fe Trail Trans. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *McDonnell Douglas v. Green,* 411 U.S. 792, 803–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

"Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977).

1977, the position of Associate Administrator was vacant, and Harmon was better-qualified then competing candidates. Dr. Stadel admitted on the stand that Harmon was refused employment solely because Harmon was white and the other candidate was black.

The County compounded its illegality by a separate Title VII violation in June, 1977. Because Quinney waived appointment, the post of Associate Administrator was again vacant. Stadel wanted to hire Harmon, but the County ordered Stadel to get a new eligibility list only because Harmon was a white male. Even after a new list was certified, Harmon was the best-qualified of the three candidates. The uncontradicted testimony reveals that Harmon was rejected solely because of his sex.

■ The County suggests that Title VII applies only to minorities. *See* County's Proposed Findings of Fact and Conclusions of Law at 20–21. That argument is foreclosed by the Supreme Court's decision in *McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

> Title VII of the Civil Rights Act of 1964 prohibits the discharge of *"any individual"* because of "such individual's race," § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1). Its terms are not limited to discrimination against members of any particular race. Thus, . . . we [have] described the Act . . . as prohibiting "[d]iscriminatory preference for *any* [racial] group, *minority or majority"* (emphasis added). Similarly the EEOC, whose interpretations are entitled to great deference, has consistently interpreted Title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would
>> "constitute a derogation of the Commission's Congressional mandate to eliminate all practices which operate to disadvantage employment opportunities of any group protected by Title VII, including Caucasians."

This conclusion is in accord with uncontradicted legislative history to the effect that Title VII was intended to "cover white men and white women and all Americans," and create an "obligation not to discriminate against whites." We therefore hold today that Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes and Jackson white.

*Id.* at 278–80, 96 S.Ct. at 2578–2579 (citations and footnotes omitted) (some emphases in original). In applying Title VII's mandate to the facts of this case, we "do not sit as a committee of review, nor are we vested with the power of veto." *TVA v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978). Our job is simply to carry out the will of Congress. The legislative history of Title VII amply demonstrates that Congress meant for hiring decisions to be made on the basis of ability and qualifications, not on the basis of race or sex; the employers' selections were to be both color blind and sex blind. *See, e. g.*, 110 Cong.Rec. 1600 (remarks of Rep. Minnish), 5423 (remarks of Senator Humphrey), 6549 (same), 6564 (remarks of Senator Kuchel), 7213 (Interpretive Memorandum of Sens. Case and Clark), 7477 (Bipartisan Civil Rights Newsletter No. 9) (1964).

These conclusions are not affected by *United Steelworkers of America v. Weber*, —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), in which the Supreme Court held that "Title VII's prohibition in §§ 703(a) and (d) against racial discrimination does not condemn all private, voluntary, race-conscious affirmative actions plans." *Id.* at ——, 99 S.Ct. at 2730. The *Weber* Court spoke in the context of affirmative action *plans*. The evidence reveals that here no plan ever existed. In twice refusing to hire Harmon, the County was not undertaking a concerted, reasoned program of preferential employment. Rather, its acts were isolated incidents based on a misunderstanding of the Consent Decree's requirements. There is no evidence that the County, before or

since the incidents at issue here, has ever denied a white or a male employment in favor of a minority or a female. Moreover, the purpose of the County's actions was not, as in *Weber*, "to break down old patterns of racial segregation and hierarchy"; the purpose was to comply with the requirements of the Consent Decree as they were understood at the time, irrespective of any patterns of racial or sexual segregation or hierarchy in the position of Associate Administrator. Furthermore, the County's acts, unlike the Kaiser program, created an absolute bar to any white male's advancement; not once but twice Harmon was denied access to the post of Associate Administrator.

C. *Title VII Defense.* Since Harmon has demonstrated prima facie that Title VII was violated, the County has the burden of "articulating some legitimate, nondiscriminatory reason for the employee's rejection." Even if it makes that showing, Harmon may still prove that these purportedly nondiscriminatory objectives were merely a pretext for its discriminatory decisions. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577–78, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The County justifies its decisions on three different grounds.

1. *Good faith.* The County argues that it refused to employ Harmon in the good faith belief that such acts were required by the Consent Decree. This argument is insufficient for several reasons. First, Title VII requires the County to articulate a "nondiscriminatory" reason for its actions. *See McDonnell Douglas v. Green*, 411 U.S. 792, 803–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Miller v. Williams*, 590 F.2d 317, 319–20 (9th Cir. 1979) (employee's refusal to do assigned work). Here, though, the County can only justify its "good faith" on racial or sexual grounds. Moreover, Title VII itself recognizes only a narrow immunity for good faith, an immunity that does not apply here. *See* Civil Rights Act § 713(b), 42 U.S.C. § 2000e–12(b) (1976). The Supreme Court has said that "good faith" is only a factor to consider in fashioning relief, not a fact determinative of liability. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Finally, *EEOC v. American Tel. & Tel.*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978), on which the County relies, did not even discuss good faith.

2. *Permissive preferential treatment.* Although at the time Harmon was refused employment he was told the Consent Decree required the hiring of a woman or a minority, the County now concedes "that the Consent Decree did not require that the selection be based on race or sex." *See* Pretrial Conference Order at 10. Nonetheless, the County argues that the Consent Decree permits it to take race or sex into account in its hiring decisions; any other conclusion would render meaningless the special certification procedures established in Paragraphs Twenty-Two and Twenty-Six of the Consent Decree. *See* County's Proposed Findings of Fact and Conclusions of Law at 24–25. The evidence reveals, however, that race and sex were not simply "taken into account"; they were the sole reasons for denying Harmon employment. In effect, the County's position is that the Consent Decree permits, but does not require, it to discriminate in hiring entirely on the basis of race and sex.

We reject both the premise and the conclusion of this argument. First, the Consent Decree does not authorize preferential hiring solely on the basis of race or sex. Paragraph One of the Consent Decree specifically states

The defendant San Diego County and its officers (elected and appointed), agents, employees, successors and all persons acting in concert with them or any of them in the performance of their official functions *shall not discriminate on the basis of race, sex, or national origin in hiring,* promotion, upgrading, training, assignment or discharge or otherwise discriminate against an individual employer or applicant for employment with respect to compensation, terms and conditions or

privileges of employment because of such individual's race, sex or national origin. (Emphasis added.) While the Decree endorses changes in examinations, selection criteria, recruitment, and training, it does not mention any sort of voluntary hiring preferences in favor of minorities. *See* Paragraphs 25–28; *see also* Paragraph 20 (transfers and assignments). Voluntary affirmative action programs were well-known at the time this Decree was filed. *See DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Bakke v. Regents of University of California*, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *aff'd in part, rev'd in part*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Had the Decree meant to sanction some type of voluntary preferential hiring in favor of minorities or women, it would have said so. Nor is discretionary hiring on the basis of race or sex implicit in Paragraphs Twenty-Two and Twenty-Six. Those paragraphs merely provide a procedure for bringing more women and minorities before the County when it is making hiring decisions.

Even if the Consent Decree did authorize preferential hiring on the basis of race or sex, it is irrelevant. The County has the burden under Title VII "of proving that [it] based [its] employment decision on a legitimate consideration, and not an illegitimate one such as race" or sex. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). The County's argument in no way challenges—indeed, it concedes—the plaintiff's showing that the County relied on race and sex in its decisions not to hire him.

*3. Collateral attack on the Consent Decree.* Throughout the litigation in this case, the County has intimated that an adverse decision constitutes a collateral attack on the Consent Decree. This argument makes two erroneous assumptions. First, it assumes that this decision "attacks" the Consent Decree. We do not, however, alter or modify the Consent Decree, the terms of which remain binding on the County. Nor do we place the County under inconsistent or incompatible obligations, since nothing in

the Consent Decree requires or permits the County to do the things we today prohibit. *Compare Oburn v. Shapp*, 70 F.R.D. 549, 552–53 (E.D.Pa.), *aff'd*, 546 F.2d 418 (3d Cir. 1976), *cert. denied*, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977) (complaint seeking to set aside Title VII Consent Decree as fraud on court); *Prate v. Freedman*, 430 F.Supp. 1373 (W.D.N.Y.), *aff'd*, 573 F.2d 1294 (2d Cir. 1977), *cert. denied*, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978) (Consent Decree ordering "temporary appointment mechanism").

■ Second, the County misconceives the binding powers of the Consent Decree. Under the fourteenth amendment's Due Process Clause, a suit may not bind a nonparty, if the nonparty's interests are not fairly represented or if he was not given notice and an opportunity to participate. *See Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Harmon was not a party in *United States v. San Diego*, Civ. No. 76–1094–S, and the County has strenuously and successfully opposed his attempts to intervene and present his interests in that litigation. Nor can it fairly be said that any party to that litigation represented Harmon's interests. In particular, the County, as a defendant employer, did not necessarily have interests identical to or parallel with those of its male white employees. *See* Consent Decree at 3. The inadequacy of Harmon's representation in the Consent Decree litigation distinguishes this case from *EEOC v. American Tel. & Tel. Co.*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978), in which unions representing the interests of whites were allowed to intervene in the Consent Decree litigation.

If the Consent Decree may not bind Harmon, it likewise may not obliterate the protections provided him by federal law.

[O]rdinarily one who acts pursuant to a judicial order or other lawful process is protected from liability arising from the act. But such protection does not exist where the judicial order was necessitated by the wrongful conduct of the party

sought to be held liable. Here, the Consent Decree on which defendant relies was necessary only because of [the County's] prior . . . discrimination. Under these circumstances the Decree provides no defense against the claims of a faultless employee such as [Harmon].

*McAleer v. American Tel. & Tel. Co.,* 416 F.Supp. 435, 440 (D.D.C.1976) (Gesell, J.) (citations omitted). The County has steadfastly opposed Harmon's intervention in *United States v. San Diego* on the ground that he can and should vindicate his rights through a Title VII suit such as this one. Harmon can hardly be faulted for pursuing the very course the County has urged.

D. *Title VII Remedy.* Since Harmon has shown the County is liable for its discriminatory refusal to hire, the court has broad equitable power to award relief. *See* Civil Rights Act § 706(g), 42 U.S.C. § 2000e–5(g) (1976). Both the County and Harmon agree that it would be inequitable to order the County to fire Euliss and reinstate Harmon in her position, since Euliss has not been a party to nor had her interests represented at this proceeding. Harmon asks for, and the County does not contest his right to, an award of back pay, costs, and attorney's fees. *See Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 720–23, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Civil Rights Act § 706(k), 42 U.S.C. § 2000e–5(k) (1976). Harmon is entitled to $22,480.00 in back pay, based upon the difference between (a) Harmon's earnings from May 11, 1977, to June 30, 1979, and (b) the pay he would have received as Associate Administrator. This figure also assumes a seven percent annual rate of interest, and it includes lost medical and parking expenses and a one-time reimbursement received by all San Diego County employees in July, 1978. *See* Exhibit V.

Harmon also asks for an award of front pay to compensate him for future earnings he would have received had the County hired him. He relies on *Patterson v. American Tobacco Co.,* 535 F.2d 257, 269 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), in which such an award was approved in dicta. As the County notes, however, Harmon may receive a windfall from this award, for the court has no way of knowing what Harmon's future income will be. Harmon is entitled to be compensated for any genuine losses resulting from the County's discrimination. Therefore, he will be permitted to petition the court annually for an award of backpay for the preceding year. This right to petition shall terminate when Harmon has been given a chance to fill any future vacancy in the post of Associate Administrator with the County, or its equal. At the time of this petition, the County may present evidence showing Harmon's failure to mitigate his losses. *See Sias v. City Demonstration Agency,* 588 F.2d 692, 696–97 (9th Cir. 1978).

In the event that any of the foregoing conclusions of law actually constitute findings of fact they are to be considered findings of fact.

ACCORDINGLY, IT IS ORDERED:

1. That the defendants are enjoined from filling any vacancy in the position of Associate Administrator or its equal for which the plaintiff is then qualified until the plaintiff is given the first opportunity to accept or reject that position;

2. That the defendant shall pay the plaintiff $22,480.00 as an award of back pay;

3. That the plaintiff shall have the right to petition the court annually for an award of any further back pay to which the plaintiff is entitled. This continuing right to back pay shall terminate if the plaintiff is offered the position of Associate Administrator or its equal and if he is at that time qualified to fill such a position;

4. That the plaintiff is awarded his costs and attorney's fees. Civil Rights Act § 706(k), 42 U.S.C. § 2000e–5(k) (1976). The amount of these costs and fees shall be determined at a future date on this court's law and motion calendar.

The foregoing Opinion shall constitute Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52.