**Robert S. MEYERS, Plaintiff,**

.v.

**FORD MOTOR COMPANY, Defendant.**

**Civ. No. 77–6011–CV–SJ.**

United States District Court,
W. D. Missouri,
St. Joseph Division.

Dec. 7, 1979.

Mark C. Ellenberg, Cadwalader, Wickersham & Taft, Washington, D. C., and W. H. Utz, Jr., Utz, Litvak, Thackery, Utz & Taylor, Saint Joseph, Mo., for plaintiff.

Alvin D. Shapiro, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

### OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT

SACHS, District Judge.

The complaint in this case was filed by a Ford Motor Company dealer, Meyers, who voluntarily terminated his dealership in the State of California, after deciding that the location was not economically viable. Meyers complains that reimbursement of his lost investment was denied to him, while a payment in lieu of such reimbursement was granted to his predecessor at the California location, a black dealer named Wright. Meyers asserts a right to recover on the theory that the benefits which were granted to his black predecessor were denied to him because he is a member of the white race. The disparate treatment, Meyers claims, permits an inference of discriminatory intent, which would violate the 1866 Civil Rights Act, 42 U.S.C. § 1981, as that section has been construed.

The conduct complained of, in 1974, became a subject of litigation in February, 1977, some months after the Supreme Court had held that the 1866 Civil Rights Act covers "reverse discrimination" in a wrongful discharge context. *McDonald v. Santa Fe Trail Transportation Company,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The case on which plaintiff rests this claim held that a sound claim of racial discrimination could be inferred, where dismissals from private employment for misconduct were confined to the complaining white persons, and a black employee guilty of such misconduct had not been dismissed.[1]

On June 7, 1979, after the completion of discovery, Meyers filed a motion for summary judgment, seeking to extend the *McDonald* ruling to cover the facts here presented. On June 27, 1979, however, the Supreme Court limited the effect of *McDonald,* at least under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.) in a decision allowing preferential selection of black employees for admission into an in-plant craft training program. *United Steelworkers of America v. Weber,* —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

Defendant Ford Motor Company ("Ford") responded to the motion for summary judgment by contending there were factual disputes which precluded granting summary

---

1. It is perhaps more than coincidental that in April, 1977, shortly after this suit was filed and less than a year after *McDonald* was decided, Ford's Minority Dealer Training Program, for which "non-whites and women were eligible," was renamed the "Dealer Training Program" and Ford began to include "other people." Frank Dep. 3, 6.

judgment to Meyers on the theory he presented. Ford suggested that a summary judgment might, on the contrary, be granted to it, citing *Weber* and relying on certain factual contentions which will be referred to incidentally, insofar as they are material to this decision. At the invitation of the Court, Ford thereafter formally filed its own motion for summary judgment.

Meyers states, in his latest brief, that he "is, as before, perfectly willing to accept the record as it stands." He contends that this is essentially a *McDonald* case, and that *Weber* is distinguishable. He relies on no authority subsequent to *McDonald*, which might expand liability for "reverse discrimination" to fit his situation.

The Court has concluded that the case at bar may lie somewhere between *McDonald* and *Weber* (assuming arguendo that the payment to Wright was race-related), but on Meyers' own theory it seems closer to *Weber*. The Court finds considerable tension between the principles of *Weber* and the principles of *McDonald*. Absent some future authoritative expansion, *McDonald* may become limited to its own set of facts, probably the context of discriminatory discharge or other invidious, harmful conduct.

As will be further discussed, moreover, *McDonald* simply holds that an allegation of disparate, harmful treatment permits an inference of racially discriminatory intent. In the present case, no racist intention can fairly be inferred; such an intention is contradicted by the facts and theories relied on by Meyers. Under his own theory of the case Meyers was denied a dealership termination payment because he lacked Wright's bargaining power. It creates no claim for Meyers that one of Wright's bargaining tactics may have been a claim of discrimination against himself, as a black.

Giving Meyers the benefit of all factual doubts, and accepting arguendo all reasonable inferences favoring plaintiff, the Court is unable to find a legal possibility of recovery in this case and therefore grants summary judgment to Ford.

## I.

The basic facts presented by Meyers in support of his motion for summary judgment (now reaffirmed in response to the Ford motion) may be summarized as follows:

1. The relevant controversy concerns the payment by Ford of $20,000 to the black dealer, Wright, at the termination of his dealership, and the denial of reimbursement to the white dealer, Meyers, of a lost cash investment allegedly in the amount of $70,000, at the termination of his dealership.

2. The dealerships were held consecutively, at the same location in California. Under Ford's standard Dealer Development Contract, a right to terminate was retained by both parties, including Ford, and a terminated dealer has a right to return of the market value of his stock, at the time of termination. Because of very considerable operating losses throughout 1973 and 1974, Wright's stock had no value when his dealership was terminated under a *negotiated* settlement in July, 1974. Meyers' stock also had no value when his dealership was *voluntarily* terminated in December, 1974.

3. Meyers voluntarily terminated his dealership when he determined the location was undesirable. He does not claim his stock had value or that any contract right gave him a right to reimbursement of his initial investment. If any reimbursement were to be made to Meyers, it would be in the nature of a gratuity, unless Ford's past practice with Wright became controlling.[2]

4. After a history of very heavy losses, Ford decided in June of 1974 that it would not extend a loan guarantee previously made for its dealer, Wright, and that "a termination of the management contract by Dealer Development will probably result."

---

2. Another portion of the original Meyers claim (Count II), was based on alleged misrepresentations by Ford *prior* to the signing of the dealership contract. Count II has been dismissed by Chief Judge Oliver, insofar as it attempts to state a federal claim, and will not be considered further in this opinion.

Pl.Exh. 24, filed in support of plaintiff's motion for summary judgment.[3]

5. After learning of Ford's intentions in a meeting with Ford management, Wright wrote a letter dated July 10, 1974, to Ford's Director of Dealer Development, C. W. Ramsay, proposing: "Alternatively, my capital contribution in the dealership could be refunded to me whereupon I would continue to operate (only) the leasing company . . . ." Pl.Exh. 18. In his letter Wright asserted: "I am successful. I am capable. I am competent. I am black. Unfortunately, the significance of those qualities is assessed in the exact reverse order or priority by the management with whom I have dealt over the past two years." Wright asserted he had been urged to be "humble, submissive and aware of my place in the scheme of things." Ramsay wrote "correct" in the margin of the letter, at the point where Wright alleged Ford had been overly sensitive to his race. This apparently indicated that the Ford official felt that Wright had received *more* favorable treatment as a dealer than if he had been white. Wright, on the other hand, was asserting that he had been "miscast" and forced to engage in "play-acting" because of his race. Wright's claim was that Ford was at least partially responsible for his recent losses.

6. In a further meeting on July 16, 1974, according to a Ford internal memorandum, Ramsay and another Ford official, C. E. Haley, rejected the request for return of Wright's " 'capital contribution' ", since "there was no justification for returning his investment." Wright argued, however, that Ford had a "moral obligation" to return the funds because Ford had allegedly "coerced him into abdicating management"; moreover, Wright asserted that "Ford should return his investment since (it) had returned the investment for all black dealers who had been unsuccessful, except Al Ligons." The Ford officials responded that "the Company did not have a policy of returning any dealer's investment, although there may have been a specific instance where there was a legal requirement to do

so." Pl.Exh. 19. Plaintiff does not contend, in support of his motion for summary judgment, that a general practice of returning the investments of unsuccessful black dealers can be shown. It appears that some 18 black dealers have failed and that only Wright and one other dealer may have received compensation. Frank Dep. 13, 19. Illinois law was the source of the other claim. Frank Dep. 14.

7. At the July 16, meeting, Wright also referred to a possibility that he would bring "legal action." Pl.Exh. 19, page 2.

8. After some further negotiations, Ford agreed to and did pay Wright $20,000 in consideration for a termination agreement which Wright executed, dated July 30, 1974. Pl.Exh. 7. The payment was somewhat similar in amount to Wright's initial cash investment of $22,100. Pl.Exh. 5. It did not, however, take into account Wright's further investments out of dealership profits, which increased his total investment to some $97,000. Pl.Dep. 73. Ford contends the sum paid may have been related in amount to another, later investment by Wright; it may also have taken into account claims by Wright as to his legal expenses. Pl.Exh. 19, page 2. For purposes of this motion, however, the Court assumes, with Meyers, that the payment was an approximation of the initial cash investment.

9. In consideration of the $20,000 payment, and other commitments by Ford in the settlement agreement of July 30, 1974, Wright agreed to the immediate termination of his management of the dealership, transfer of his stock to Ford without further valuation proceedings, and the mutual release by the parties of "each other, their heirs, successors and assigns, from any and all claims or demands each of them, may have against the other on account of anything occurring before the date of this letter, whether under the antitrust, dealer or other laws or otherwise." Pl.Exh. 7.

10. An explanatory memorandum from John B. Naughton, Ford's Vice President,

---

3. Further references to exhibits all relate to the same filing by Meyers.

Sales Group, was thereafter directed to Ford's President, L. A. Iacocca. Pl.Exh. 16. The memorandum was written "because of (Wright's) influence with other black dealers and in the black community, and his association with various members of Ford management . . ." After reciting a history of losses and of questions about Wright's managerial performance and asserting that "an unusual effort (had been made) to give Mr. Wright an opportunity to turn the dealership around," the memorandum stated that $20,000 had been paid to Wright "to obtain his resignation and general release, rather than go through the process of termination." While the memorandum does not state that Ford's public relations with the black community had any bearing on the settlement, the Court assumes that Meyers might establish a submissible issue on that point. An earlier draft of the memorandum expresses concern about "unfavorable publicity we would receive as the result of litigation." Pl.Exh. 25.

11. The nature of possible claims by Wright, for which a release was sought, is somewhat vague. As noted, there is documentary reference to antitrust laws, dealer protection laws (which might have delayed Ford's future plans for the location) and written hints by Wright that he might claim racial discrimination (the alleged policy of coercing him into "play-acting"). Ramsay acknowledged on deposition that he may have told Meyers that Wright had threatened Ford with a racial lawsuit. Ramsay Dep. 80–1. The Court accepts, for purposes of this motion, the theory that the $20,000 payment may have been made (at least in part) for the reasons developed by Meyers, including avoidance of race discrimination litigation and possible adverse publicity affecting Ford's reputation in the black community.

12. There is no basis for claiming, and apparently Meyers does not claim, that the problems which supposedly caused the payment were mere pretexts or excuses to justify a Ford policy or practice of favoring its black dealers or former dealers, simply because of their race.

13. Neither party had a motive to develop, and neither has discussed whether Ford has a low percentage of black dealers and management officials, as compared with the black percentage of the work force. Plaintiff's deposition apparently recognizes that there is a shortage of black Ford dealers. Pl.Dep. 24–5. Naughton testified that "we had very few minority dealers . . . and our first objective was to try to get one in every district, at least one." Naughton Dep. 9. There is some testimony indicating there were 26 minority dealers who stayed in business (Frank Dep. 19) out of some 5600 dealers. Ramsay Dep. 90. For purposes of this decision the Court assumes that any numerical deficiency of black dealers has social causes not necessarily attributable, even in part, to Ford Motor Company. Wright could, of course, have made a contrary assertion.

## II.

On its face, the Meyers claim asks the Court to stretch beyond recognition the statutory guaranty that all persons shall have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . ." 42 U.S.C. § 1981. If given full effect, the Meyers theory would seem to require that Ford gratuitously refund the initial cash investment of all unsuccessful white dealers, thereby constructively treating such dealers as though they had the race-related bargaining power of an unsuccessful but apparently widely known black dealer, who was threatening to claim discrimination.[4]

---

4. The Court sees no logical limitation of rights to Meyers, as Wright's successor. In apparent recognition of the fact that logical extension of the claim to all dealership terminations of white dealers, wherever situated, would be hard for any court to accept, Meyers declined, in an earlier effort to assert a class action, to state "how the class should be defined . ." Plaintiff's Statement Concerning Class Certification, June 7, 1979. The Court thereafter declined to designate the litigation as a class action.

The Court acknowledges that in the *Mc-Donald* litigation part of the stretching of § 1981 did occur. The primary holding in *McDonald* extended the 1964 Civil Rights Act to cover Title VII claims by white persons asserting employment discrimination in favor of blacks. The opinion goes on to conclude that § 1981 may also be invoked by white persons claiming employment discrimination. Disregarding the express Congressional assumption that the contract rights of white persons were already fully recognized in 1866, and that such rights were to be made the standard for testing racial discrimination against others, the Supreme Court read into the legislation a prohibition against race discrimination against white persons.

The *Weber* decision, in June, 1979, cuts back the potential for "reverse discrimination" claims of employees, under Title VII of the Civil Rights Act of 1964. White persons are only protected from "*certain forms* of racial discrimination." —— U.S. at ——, 99 S.Ct. at 2726, 61 L.Ed.2d at 487. Since the acts are to be harmonized, to the extent possible, the Court believes *Weber* applies equally to contract-discrimination claims under the 1866 law. *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1316 (7th Cir. 1974), *cert. den.* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823; *Carrion v. Yeshiva University*, 535 F.2d 722, 729 (2d Cir. 1976). While the dividing line between *Weber* and *McDonald* is unclear, and there is almost no case law to provide guidance, the Court is inclined to believe that the *McDonald* prin-

ciple could be limited to invidious and injurious discrimination. —— U.S. at ——, 99 S.Ct. at 2730, 61 L.Ed.2d at 492. *Weber*, by contrast, could be expanded to allow benefits to be distributed by private employers in less than even-handed fashion, at least where the purpose is benign with respect to the white person who has been denied the benefits.

Plaintiff asserts a quite different dividing line between *Weber* and *McDonald*. Plaintiff contends that *Weber* should be limited to judicial sanctioning of "formal affirmative action programs" which survive testing under a rule of reason. There is much cautious language in *Weber* allowing the Supreme Court to retreat to that position.

It may be argued, however, that the essential thrust of *Weber* lies in the explanation that Congress, even in the comprehensive legislation of 1964, intended to leave private employers generally free to engage in unregulated race-related employment practices of a benign nature, such as affirmative action programs, assisting racial minorities who have been historically disadvantaged. —— U.S. at ——, 99 S.Ct. at 2728, 61 L.Ed.2d at 490–1. Unless Congress steps in again, it is clearly possible that the *Weber* principle, by logical growth, will sanction a broad range of activities by *private* parties which may be categorized as "benign discrimination." [5]

Since Meyers complains of unequal distribution of benefits, favorable to a black per-

---

[5]. When the Supreme Court sanctioned the benevolent use by a private employer of fixed and formal quotas, in *Weber*, the ruling would seem, as a matter of logic and good sense, to supply an umbrella for the permissive use of a wide variety of less drastic informal goals and individual acts favoring minority employment and upgrading of jobs held by minorities. It would seem that *Weber* would allow a private employer or contracting party to "go an extra mile" in recruitment and retention efforts directed toward disadvantaged minorities. For several earlier cases, unrelated to *Weber*, which develop a comparable rationale, see *Hollander v. Sears, Roebuck & Co.*, 450 F.Supp. 496, 505–6 (D.Conn.1978) and *Germann v. Kipp*, 429 F.Supp. 1323, 1337 (W.D.Mo.1977),

vacated as moot, 572 F.2d 1258 (8th Cir. 1978). See also *Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977—sustaining "benign" redress for " 'society's longstanding disparate treatment of women' ").

The suggested broad reading of the *Weber* principle does not, of course, necessarily imply a personal preference for quotas or other forms of "benign discrimination." See *Hughes v. Superior Court*, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), where Justice Frankfurter was apparently appalled by the community relations aspect of employment quotas, but nevertheless noted that local public policy would not necessarily "forbid the employer to adopt such a quota system of his own free will" (l. c. 468, 70 S.Ct. 723).

son, it is possible he should lose this case under an expanded version of *Weber*, even if discrimination because of race were conceded. Because of the novelty of the issue, the Court notes it for consideration in the event of an appeal, and rests its decision on narrower grounds discussed below.

### III.

Using another approach, the conduct complained of is simply outside the coverage of § 1981, because Meyers has been denied no right of contract, and the disparate treatment, though possibly race-related, is not really a discrimination "because of race." The Court assumes, for example, that § 1981 does not make it unlawful for a black entertainer or sports figure to be employed for a television commercial for the candid purpose of improving the sponsor's public relations in the black community, and appealing to that segment of the population. It would also seem clear that payments to avoid race-related problems may not be equated with acts of race discrimination; they merely recognize economic leverage.

If the above distinction seems subtle, it is of a variety which has commanded authoritative support, in the same legal context. In the *Bakke* decision, the controlling opinion of Mr. Justice Powell withheld Equal Protection approval for minority racial preference in student selection, if based on a direct attempt to remedy past societal discrimination, but approved such preferences, if based on the educational objective of attaining "a diverse student body." *University of California Regents v. Bakke*, 438 U.S. 265, 310–1, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). A very recent ruling by my colleague, Judge Clark, uses "better public relations" in the black community as a major factor justifying a special minority recruitment program in the Kansas City police department. *Doores v. McNamara*, 476 F.Supp. 987, 995 (W.D.Mo.1979). See also the ruling by my colleague, Judge Hunter, rejecting a charge of "reverse discrimination" in the Kansas City fire department. *Germann v. Kipp*, supra, 429 F.Supp. at 1332, 1337.

The *McDonald* ruling itself, on which plaintiff principally relies, shows that benign intent (motivation which is not racist) provides a complete defense to a complaint of reverse discrimination because of race. 427 U.S. at 282, 96 S.Ct. 2574. In his concurring opinion in *Weber*, Mr. Justice Blackmun also refers to benign intent as a refutation of claims of racist misconduct. —— U.S. at ——, 99 S.Ct. at 2732, 61 L.Ed.2d at 494. The plaintiff in this case has developed some proof that Ford Motor Company may have given a preferential payment partly because it feared litigation claiming discrimination against a black dealer. Ford may well have feared that such litigation would prove damaging to Ford's public relations in the black community. Pl.Exh. 25. Plaintiff has not shown, however, that the establishment of such motivation would weaken Ford's defense of this case. The Court believes that the economic motivation which plaintiff hypothesizes would wholly refute any inference of racist misconduct which might otherwise arise from a showing of disparate treatment. A "subjective intent to discriminate" must be established before a violation of § 1981 can be found. *Newton v. Kroger Co.*, 83 F.R.D. 449, 454 (E.D.Ark.1979). Plaintiff's tendered proof thus offers to Ford a complete defense in this litigation.

The Court acknowledges that this analysis may not always be capable of reverse application. Obviously an employer could not hide behind an "economic justification" if he were to refuse to employ or to promote blacks because his customers or clients might object. Even a remote race-related reason would not be acceptable, in construing civil rights legislation, when a black complains of discrimination which frustrates a major objective of the act.[4] In the present context, however, reverse application is possible, as it is quite unlikely that any future settlement favoring Meyers in this case, because of his reverse discrimination claim, would require Ford to institute a general practice of making dealer-separation payments to its black dealers. More-

over, it is not necessary to use a mirror image in analyzing the complaint of Meyers, a white person. The Court is impressed by the validity of the following observation in a very recent Sixth Circuit decision:

"*Bakke* and *Weber* make it clear that a case involving a claim of discrimination against members of the white majority is not a simple mirror image of a case involving claims of discrimination against minorities. One analysis is required when those for whose benefit the Constitution was amended or a statute enacted claim discrimination. A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a class historically subjected to discrimination the case moves with the grain of the Constitution and national policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain." *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979).

The alleged motivation here may be less admirable than that described in *Detroit Police*. But even on plaintiff's theory, adopted arguendo, Ford's motivation was benign rather than racist.

It must therefore be concluded that Ford Motor Company did not deny to Meyers any contract right or opportunity because of his race, and plaintiff has no claim under § 1981. In the absence of dispute as to any fact which the Court considers to be material to this conclusion, summary judgment will be entered in favor of the defendant, at plaintiff's costs.

IT IS SO ORDERED.