Jerry W. LEHMAN, Plaintiff-Appellee,

v.

YELLOW FREIGHT SYSTEM, INC., Defendant-Appellant.

No. 80–2180.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1981.

Decided June 17, 1981.

Rehearing and Rehearing En Banc Denied August 11, 1981.

James E. Hughes, Indianapolis, Ind., for defendant-appellant.

Robert S. Koor, Muncie, Ind., John H. Haskin, Haskin & Kough, Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, PELL and WOOD, Circuit Judges.

SWYGERT, Circuit Judge.

The narrow issue for review in this case is whether the actions of Yellow Freight System, Inc. in refusing to hire plaintiff Jerry W. Lehman were in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981. The district court entered judgment for the plaintiff. We affirm.

I.

Yellow Freight System, Inc. (Yellow Freight) is an interstate trucking company with national headquarters in Kansas City, Missouri. Yellow Freight maintains trucking terminals of various sizes throughout the mideastern portion of the United States. The focus of this case is Yellow Freight's terminal in Muncie, Indiana.

The terminal at Muncie is one of the smaller terminals in the Yellow Freight system. Employees at other larger terminals are engaged primarily in driving trucks between major cities. Employees at the Muncie terminal, however, are referred to as "combination men"—that is, they not only drive trucks but also work at loading and unloading freight on the terminal dock.

The work force at the Muncie terminal consists of two groups of employees—regular employees with seniority and temporary workers who fill in to replace vacationing or sick employees or who are called in to assist in peak periods. These temporary employees are referred to as "casuals." Casuals have no right to continued employment nor are they members of the union.[1]

A casual employee can eventually obtain regular status. The governing collective bargaining agreement provides that if a casual works thirty days within a ninety-day period he would acquire seniority and thus become a regular employee.[2]

Plaintiff Lehman is a white male. Beginning on October 31, 1972 he was called in as a casual employee. Dennis Tidwell, a black male, was also a member of the group of casual employees. Tidwell began to work as a casual on November 14, 1972.

Late in 1972, an opening occurred for a combination worker at the Muncie terminal. Both Lehman and Tidwell filed applications for the position. As we noted above, the job of combination worker required both the driving of trucks—usually making pickup and deliveries within a twenty-five mile radius of Muncie—and the loading and unloading of freight on the dock. Lehman had driving experience and held a valid chauffeur's license, as required by Indiana law. Ind. Code 9-1-4-50.[3] Although Tidwell did not possess a chauffeur's license at the time of his hire,[4] there was testimony that Tidwell obtained a chauffeur's license within three days of his hiring.[5] Finally, Tidwell did not have any driving experience and did require some on the job training.[6]

At this time, the manager of the Muncie terminal was Gary McDonald. After reviewing and evaluating the applications of Lehman and Tidwell and discussing the applicants with other terminal employees, McDonald selected Tidwell for the position. Tidwell was hired by the process which

1. The employees were members of Teamsters Local 135.

2. Plaintiff's exhibit # 7.

3. The district court found that:

   Lehman obtained a valid chauffeur's license and, therefore, possessed a valid chauffeur's license when he began work with defendant.

   . . . . .

   [Lehman] had previous commercial driving experience and had driven in the United States Army.
   R. at 261.

4. The district court found that "Tidwell did not have a valid Indiana chauffeur's license on November 14, 1972. . . ." R. at 261.

5. Tr. at 153.

6. The district court found that:

   Lehman did not require assistance or training in the operation of defendant's trucks.

   . . . . .

   Tidwell required and received assistance and training in the operation of defendant's trucks. . . .
   R. at 262.

required a casual to be put on regular status once he has worked thirty days within a ninety-day period.[7]

Subsequent to Lehman's rejection, he filed the instant action alleging a violation of his rights under Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. At the time the action was filed, the Supreme Court had decided *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and had granted certiorari in *Weber v. Kaiser Aluminum & Chemical Corp.*, 563 F.2d 216 (5th Cir. 1977), *cert. granted*, 442 U.S. 927, 99 S.Ct. 2856, 61 L.Ed.2d 295 (1978).

Lehman and Yellow Freight apparently proffered evidence with the thought that the state of the law was that *Bakke* prohibited the use of quotas in affirmative action (and presumably that the Supreme Court would so rule in *Weber*). Thus, Lehman

7. The time worked by Lehman as a casual decreased as Tidwell's hours increased to a total regular work week. Tidwell's work total during the relevant time period is set forth below:

| Period | Hours | |
| --- | --- | --- |
| 11-11 to 11-18-72 | 32 regular | 1.94 overtime |
| 11-18 to 11-25-72 | 32 | .1 |
| 11-25 to 12-1-72 | 40 | 4.64 |
| 12-2 to 12-8-72 | 40 | — |
| 12-9 to 12-15-72 | 40 | .87 |
| 12-16 to 12-22-72 | 40 | 2.72 |
| 12-23 to 12-29-72 | 32 | — |
| 12-30-72 to 1-6-73 | 40 | — |
| 1-6 to 1-12-73 | 39.25 | 2.46 |
| 1-13 to 1-19-73 | 40 | 3.6 |

Plaintiff's exhibit # 11.
Lehman's hours, set forth below, show the corresponding decrease.

| Period | Hours | |
| --- | --- | --- |
| 10-28 to 11-3-72 | 36 regular | 1.72 overtime |
| 11-4 to 11-10-72 | 32 | 2.7 |
| 11-11 to 11-18-72 | 40 | 1.98 |
| 11-18 to 11-24-72 | — | — |
| 11-25 to 12-1-72 | 8 | .65 |
| 12-2 to 12-8-72 | — | — |
| 12-9 to 12-15-72 | 8 | .62 |
| 12-16 to 12-22-72 | 8 | 1.54 |
| 12-23 to 12-29-72 | — | — |
| 12-30-72 to 1-6-73 | — | — |
| 1-6 to 1-12-73 | 8 | 2.52 |
| 1-13 to 1-19-73 | 8 | 2.00 |

Plaintiff's exhibit # 12.

8. Plaintiff's exhibits # # 1, 13–17, 21–43.

9. This emphasis on *Bakke* also can be seen in the plaintiff's proposed findings and conclusions submitted prior to trial.

offered much documentary evidence demonstrating that Yellow Freight had a quota system and that Tidwell was hired pursuant to that program.[8] Yellow Freight's manager at the Muncie terminal, Gary McDonald, likewise had the *Bakke* decision in mind when describing his decision to put Tidwell on permanent work. While McDonald testified to the existence of attainment levels, he denied remembering the documents from Yellow Freight's national office that set up Yellow Freight's quota-type affirmative action plan. McDonald testified that he did not hire Tidwell pursuant to any quota, but rather that he counted Tidwell's race as a factor in his favor.[9]

The district court delayed making its findings of fact and conclusions of law pending the Supreme Court's *Weber* decision. After *Weber* was handed down, the district court found for Lehman. The district court found that:

33. At all times relevant hereto, defendant had in full force and effect an affirmative action or minority hiring program.

34. The defendant's affirmative action or minority hiring program was an internal self-imposed quota program initiated and maintained by the defendant.

35. For 1972, defendant had a self-imposed minority increase quota for its Muncie, Indiana terminal, for city or combination drivers that required the next city or combination driver hired be a minority and then one more minority city or combination to be hired in the next ten hirings or said position stated as follows:

Next one (1)
The one (1) in ten (10).

Appendix for Appellant at 13. *Compare* Findings of Fact, R. at 264.

The Supreme Court decision in *Weber* was handed down June 27, 1979. Lehman's position, and that adopted by the district court, apparently was that although Yellow Freight had an affirmative action plan, either the plan failed to comply with *Weber* or Tidwell was not hired pursuant to the plan. Yellow Freight attempts to rely on Lehman's evidence establishing an affirmative action plan and contends that it is permissible under *Weber*. As discussed below, we believe that the district court concluded that Tidwell simply was not hired pursuant to Yellow Freight's affirmative action plan. Therefore, we need not discuss whether the plan complies with Title VII as interpreted in *Weber*.

The existence of an actual affirmative action program was never proven or litigated.

Defendant admittedly was not acting under an organized affirmative action program.

The actions by defendant are impermissible pursuant to *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) and beyond that case's narrow decision.

R. at 264, 266. The district court awarded damages, reinstatement, retroactive seniority and attorney's fees.

## II.

■ Yellow Freight raises several challenges to the district court's findings of fact and conclusions of law. Specifically, Yellow Freight attacks the district court's findings that "The existence of an actual affirmative action program ... was never proven or litigated" and that "Defendant admittedly was not acting under an organized affirmative action program." Brief and Appendix for the Appellant Yellow Freight System, Inc. at 8. Yellow Freight relies on the documentary evidence offered by Lehman to prove the existence of quotas and the testimony of McDonald and David Wolfram, Yellow Freight's Director of Manpower, Planning and Development, which described an affirmative action program.

We read the district court's findings on the existence of an affirmative action program as stating that while Yellow Freight's national office might have set up a detailed plan for affirmative action, Tidwell was not hired pursuant to this plan. Yellow Freight disputes this characterization of the evidence. We conclude that this finding is not clearly erroneous.

The record makes clear that Yellow Freight's national headquarters was sensitive to the problems of affirmative action as early as 1968. Eventually, this sensitivity crystallized into a formal affirmative action plan that set out minority hiring quotas for the various Yellow Freight terminals. Included in the plan was the Mun-

cie terminal. The documentary evidence is replete with references to the Muncie terminal and the need for minority hiring at the terminal. Indeed, in the relevant time period (December 1972), in a memorandum dated April 13, 1972 from the Yellow Freight national office entitled "Regional Minority Increase Quota for 1972," the Muncie terminal position for city or combination worker had a minority quota of "Next 1 ... Then 1 in 10."

Yellow Freight points to several portions in the transcript that apparently tie McDonald's hiring decisions to Yellow Freight's affirmative action program. But the weight of McDonald's testimony is to the contrary. We set forth McDonald's testimony in some detail to demonstrate that his decision was not made pursuant to Yellow Freight's plan.

Q. Did you receive inquiries from anyone in Yellow Freight during the time you were terminal manager there or during this period of time we are talking about hiring blacks and minorities?

A. If I did, I don't recall, I really don't.

Tr. at 50.

Q. Did you ever make a yearly report to the home office listing the race or minority status or sex of your employees at the Muncie terminal?

A. No, sir, not to my knowledge.

Tr. at 56.

Q. Do you keep a separate file on minorities?

A. I never did and don't now.

Tr. at 80.

The testimony turned to a discussion of quotas at the Muncie terminal.

Q. Isn't it a fact because [Tidwell] was black and you had a quota to hire blacks?

A. I wouldn't agree with that statement. . . .

Q. You did have a quota there at the time? Didn't you?

A. I don't recall.

Q. Well, you recall when we talked about this at your deposition, quotas?

A. Only vaguely.

Q. Well, let me refresh your memory. . . . Prior to your preparation for today have you ever heard of such a system or minority quota system within Yellow Freight?

A. Probably my reply was something about attainment level. . . .

Q. What is the difference between an attainment level and a quota?

A. In that time period I do not recall having anything mentioned to me about quotas or minority quotas. . . .

Q. Well what was the attainment level as you call it at the Muncie terminal in 1972?

A. I have no idea.

Tr. at 57–58.

Lehman introduced a series of documents that set forth Yellow Freight's affirmative action program. Again, McDonald's testimony is illuminating on whether he was acting pursuant to Yellow Freight's affirmative action plan. On cross-examination, McDonald was asked several questions about the relevant documents.

Q. [Y]ou were shown . . . Plaintiff's Exhibits 13 and 14, 15, 16, 17 and 22 through 28? [These documents set up quotas and contain advice for minority hiring.]

A. Yes, sir.

Q. Now . . . have you ever seen any of those documents before?

A. 13 and 14, 15, 16 and 17, I have never seen any of those. Now, 22, 23, 24, 25, 26, 27 and 28, I can't recall ever having seen those before other than at the deposition.

Q. In your business life therefore with Yellow Freight you did not see any of those documents?

A. No sir.

Tr. at 144–45.

Finally, McDonald discussed the apparent divergence between Yellow Freight's affirmative action program and his job performance at the Muncie terminal.

Q. What you have told us here today about the quotas, the affirmative action

program is all you can remember or during the period of time we are talking about?

A. I don't know whether I touched on this earlier in the testimony or not but when I was promoted and my predecessor was promoted I think I became more wrapped up in a lot of other things that to me were of much more importance and naturally anybody at my age at that time would want to progress as rapidly as possible, which I did. Therefore, I wanted to do the job that other people felt I could do or obviously I would not have been promoted so paying specific particular, using tunnel vision attention to affirmative action program, quota system . . . just was not my priority at that time.

Q. From what we have been discussing here today does that affirmative action program appear to be of major concern of the company at the period of time we are talking about?

A. Yes, I would say it was but at that time my priorities were not necessarily the same as what the company's were because I was new at the job function I was performing.

Tr. at 155–56.

Although Tidwell's final approval for hiring was made by Yellow Freight's home office, it was McDonald's decision to select Tidwell over Lehman that allowed Tidwell to be put on regular status. Therefore, the proper focus of inquiry in this case is not whether Yellow Freight had an affirmative action plan but rather if it did, was McDonald acting pursuant to the plan. If not, Yellow Freight hardly can assert the plan as a defense in this action.

There is some evidence in the record which indicates that McDonald was aware of the need for hiring minority employees at the Muncie terminal. However, there also was evidence which proved that McDonald's knowledge of Yellow Freight's affirmative action plan was sparse at best and that he was only vaguely aware of the plan. Hence, the district court's finding that Tidwell was not hired pursuant to an organized

affirmative action plan should not be disturbed.

## III.

■ Having concluded that the district court's finding that Tidwell was not hired pursuant to an organized affirmative action program is not clearly erroneous, we now examine whether McDonald's actions were nonetheless permissible under *Weber*.

As discussed above, there can be little doubt that although McDonald did not act pursuant to an organized affirmative action program, he did have some kind of affirmative action idea in mind when he hired Tidwell. His testimony makes this evident.

Q. Was race a factor?

A. In Mr. Tidwell's case I would suspect, you know, the color of his skin might be in his favor. . . .

Tr. at 77.

Q. Did you count Dennis Tidwell's race for him?

A. I'm sure in Dennis Tidwell's case that was probably in his favor.

Tr. at 143.

McDonald also testified on the existence of attainment levels and affirmative action generally at the Muncie terminal. The issue thus presented in this case is whether McDonald's informal decision to give Tidwell's race a plus factor and hire him is consistent with the Supreme Court's decision in *Weber*.

Initially, we note the dearth of authority on this issue.[10] Most post-*Weber* decisions have been concerned with other issues. *See Detroit Police Officer's Association v. Young*, 608 F.2d 671 (6th Cir. 1979), cert. denied, —— U.S. ——, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) (no need to prove persons benefiting from affirmative action were victims of prior discrimination nor need to have judicial determination of discrimination); *United States v. City of Miami*, 614 F.2d 1322 (5th Cir.), reh'g granted, 625 F.2d 1310 (5 Cir. 1980) (whether affirm-

**10.** Two district court cases have discussed the legality of informal affirmative action decisions under Title VII and § 1981. *Meyers v. Ford Motor Co.*, 480 F.Supp. 894 (W.D.Mo.1979); *Harmon v. San Diego County*, 477 F.Supp. 1084 (S.D.Cal.1979).

In *Meyers*, plaintiff, a Ford dealer, had his dealership voluntarily terminated and complained under § 1981 that Ford failed to reimburse him for a deposit initially made while it had reimbursed his predecessor dealer, a black. Ford responded that while it had no general practice to return the deposit only to blacks, it was done in this instance to avoid adverse publicity and possible litigation. The court ordered summary judgment for Ford and offered two rationale for its decision. First, the court believed that the *Weber* decision could be extended to include informal individual acts favoring minorities. The court stated that *Weber* allowed an employer to go an "extra mile" to recruit and retain black employees. Also, the court explicitly rejected plaintiff's argument that *Weber* was limited to formal affirmative action programs but indicated that *Weber* allowed employers to engage in unregulated race-related employment practices. 480 F.Supp. at 899 n.5. Second, the court also offered a narrower rationale for its decision. It concluded that there was simply no proof of race discrimination and that Ford's actions were economically, and not racially motivated.

In contrast to *Meyers*, the language in *Harmon* appears to question informal affirmative action decisions. *Harmon* concerned a white male who twice was rejected for a position as a hospital administrator. The defendant apparently contended that the rejection was pursuant to an affirmative action plan and was proper under *Weber*. The court rejected this argument and concluded that the rejection was not a reasoned program of preferential employment but rather, a series of isolated incidents based on a misunderstanding of a consent decree into which the county had entered. 477 F.Supp. at 1089.

*Meyers* and *Harmon* each offer a slightly different interpretation of how *Weber* interfaces with informal affirmative action procedures. Yet we need not select a single approach as a rule of universal application. We do note that *Meyers* is not controlling precedent—it being a district court decision from the Ninth Circuit. Also, the court's discussion in *Meyers* about *Weber* is obiter dictum—the court offering a narrower ratio decidendi for its decision.

As noted, *supra*, we need not set down general principles to govern all informal affirmative action decisions. We are merely faced with determining the legality of the actions in this decision. *See also Thomas v. Basic Magnesia*, 22 FEP 1284, 1286 (N.D.Fla.1980) (affirmative action plan was loosely formulated concept existing only in mind of personnel manager) (dictum); *cf. Savage v. McAvoy*, 23 EPD ¶ 31,085 (S.D.Ohio 1980) (analyzing informal affirmative action in constitutional context).

ative action plan unduly burdened rights of non-minority employees and whether goals or quotas are per se unconstitutional); *Tangren v. Wackenhut Services, Inc.*, 480 F.Supp. 539 (D.Nev.1979) (whether non-minority employee rights are unduly burdened); *Cohen v. Community College of Philadelphia*, 484 F.Supp. 411 (E.D.Pa.1980) (whether plan is unyielding preference for all minority hiring).

Although *Weber* did not attempt to determine when less structured affirmative action employment decisions might be made, we believe that the factors the Court discussed that led to the upholding of the Kaiser plan provide guidance in resolving that question.

*Weber* concerned an affirmative action program adopted by Kaiser Aluminum & Chemical Corp. and the United Steelworkers of America. The plan attempted to incorporate minorities into Kaiser's exclusively white craftwork forces. A percentage of blacks equal to the percentage of blacks in the local labor force was set as the goal for each plant. To meet this goal, each plant had reserved 50% of the openings in craft training programs for blacks. This training program selected workers for trainees from the pool of Kaiser production workers. Several white production workers bid for the position but were rejected in favor of black production workers with less seniority. One of the rejected white workers, Brian Weber, instituted a class action alleging violations of Title VII.

After discussing the general statutory issue of whether Title VII *"forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans . . . in the manner and for the purpose provided for in the Kaiser-USWA plan," 443 U.S. at 200, 99 S.Ct. at 2726, the Court examined the particularities of the Kaiser plan.[11] The Court, in upholding the plan, noted several significant aspects of the plan. The Court noted that the purpose of the plan, "to break down old patterns of segregation," mirrored the purpose of Title VII. 443 U.S. at 208, 99 S.Ct. at 2730. Furthermore, the Court stated that the plan did not unnecessarily infringe the rights of white employees. *Id.* Finally, the Court concluded that the plan was but a temporary measure not intended to maintain racial balance but designed to eliminate racial imbalance in the Kaiser craftwork labor force. When that goal was achieved (as soon as the percentage of black craftworkers in the plant approximated the percentage of blacks in the local labor force), the plan would terminate. *Id.*[12]

Analyzed in light of these criteria,[13] we believe that McDonald's ad hoc informal

---

**11.** The Court's entire discussion of the particularities of the Kaiser plan occupies less than two pages in the United States Reports. 443, U.S. at 209–10, 99 S.Ct. at 2731–32.

**12.** We note that *Weber* was the first Supreme Court decision on the issue of affirmative action which had a majority opinion. In *Bakke*, the Court split into a four-one-four grouping with Justice Powell providing the crucial vote for each four member bloc.

**13.** The Court in *Weber* distinguished *Bakke* on the basis that *Bakke* involved Title VI of the Civil Rights Act of 1964, which incorporated the commands of the Fifth and Fourteenth Amendments. Therefore, the Court refused to read Title VI and Title VII as being in pari materia. 443 U.S. at 206 n.6, 99 S.Ct. at 2729 n.6.

We conclude that the constitutional analysis set forth in *Bakke* (embodying traditional equal protection analysis) provides little guidance in the area of purely private conduct under Title VII. This is made clear by the relative absence of any discussion of *Bakke* in the *Weber* decision. Because *Weber* involved Title VII, which is at issue in the present case, we believe that it sets forth the relevant analysis in this area.

At one point in his brief, Lehman contends that *Bakke* controls because the existence of an absolute quota in Yellow Freight's plan was the same as the quota condemned by a majority of the Court in *Bakke*. Because we do not decide the lawfulness of Yellow Freight's plan but rather McDonald's actions at the Muncie terminal, we need not decide if *Bakke's* condemnation of quotas in the Title VI context was rendered inapplicable by the arguable existence of a quota in *Weber*. *See also Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (upholding 10% minority set-aside). One commentator has indicated that in some ways *Fullilove* is a disavowal of *Bakke*. Boyd, *Affirmative Action in Employment—The Weber Decision*, 66 Iowa L.Rev. 1, 61 (1980).

affirmative action decision is not insulated from Title VII liability. *Weber* attempts to strike a balance between the societal interest in affirmative action and the right of individuals to be free from race discrimination. The various factors identified in the Kaiser-USWA plan achieved a proper relationship between these two values.

The final factor enumerated by the Court is of especial significance to our analysis in the instant case. The Court emphasized the temporary nature of the plan and that it would exist only until the percentage of black craftworkers in the plant approximated the percentage of blacks in the local labor force. This aspect of the plan is significant in that it emphasizes the remedial aspect of voluntary affirmative action—that is, "innocent" non-minorities must pay the price to remedy past discrimination that resulted in minority exclusion from the labor force. When the balance is reached, however, such a race preference may place an unfair burden on "innocent" non-minorities.

■ Thus, *Weber* sets forth certain procedural and substantive commands for affirmative action programs. First, there must be some need—remedying some past discrimination[14]—for a plan. Of course, this past discrimination need not be proof of *de jure* discrimination. At the least, however, some type of statistical disparity between the local labor force and the minority composition of the employer's work force is the first step in assessing whether that employer decides properly to institute an affirmative action plan. Once the need for affirmative action is discerned, the employer can then go about setting up a plan which will meet that need. In this case McDonald's decisions failed at the first step of inquiry. McDonald did not have any clear idea about the percentage of blacks in the local labor force.

Q. Did you know what the percent of minorities of Muncie was at this time?

A. No sir.

Tr. at 192.

A. [W]hen I first became acquainted with the term attainment level ... I am almost positive I did not know or have any privilege to the numbers you have just given me as to what the ratio was for the Muncie area.

Tr. at 194.

McDonald therefore appeared to hire Tidwell[15] without any idea of a goal for which minority hiring should reach nor with any idea of when such a level was reached. We believe that such a system is fraught with dangers. If the individual making the hiring decisions is unaware of the goal (such as the local labor force) he may unfairly discriminate against non-minority employees beyond a reasonable goal.[16]

14. Of course, we need not decide if under certain circumstances the concept of "need" includes reasons other than past discrimination. *Cf. Minnick v. California Dep't of Corrections*, 95 Cal.App.3d 506, 157 Cal.Rptr. 260 (1979), *cert. dismissed*, 449 U.S. 947, 101 S.Ct. 348, 66 L.Ed.2d 211 (1981) (affirmative action plan requiring composition of prison staff to reflect percentages of minority groups in prison).

15. Of course, it might be contended that five Justices in *Bakke* stated that it was not always impermissible to include race as a factor in the decision-making process and that simply is what McDonald attempted to do. We find this contention deeply flawed. *Bakke* did allow race to be used as a preference, but it is an extraordinary step to then conclude that *Bakke* sustained the type of informal decision made in the instant case. Also, as discussed in note 13 *supra* we believe that the concerns reflected in the *Weber* decision, not simply those set out in *Bakke*, govern the instant decision.

16. It might be argued that McDonald's decision to hire Tidwell was the only affirmative action decision made and that the statistics in the record demonstrate that Tidwell's hiring did not exceed the percentage of minority employees in the local labor force. Therefore, the hiring decision is consistent with the reasoning of *Weber*—that is, the hiring was not to maintain racial imbalance but to have the local minority labor force fairly represented in the work force. The record apparently indicates that the percentage of the local minority labor force was approximately six percent. Plaintiff's Exhibit # 44. Prior to Tidwell's hiring there was one black employee out of a total of 30. Tr. at 191, 195. Tidwell's hiring therefore meant that the minority representation at the Muncie terminal approximated, and did not greatly exceed, the local minority labor force.

Inextricably tied to this need to be aware of at least statistical disparities in order to set up a plan is the existence of a time limit on the plan. As the Court stated in *Weber*:

> Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force.

443 U.S. at 208–09, 99 S.Ct. at 2730. Again, McDonald's informal decision to give minorities a preference apparently could have gone on past the appropriate time. There is no indication either way in the record. Yet the danger of continuing past the appropriate time is evident absent a time limit. McDonald may well have decided to give racial preferences to the next two hirees. This might have pushed the need for remedial action past the relevant percentage and in conjunction with the absence of some kind of control poses serious dangers for the rights of non-minority applicants.

In no way should our decision on this issue be understood as a setback for affirmative action in general or affirmative action at smaller places of employment.[17] We emphasize the rather unique record of this case and its interpositioning between the Scylla of *Bakke* and the Charybdis of *Weber*.[18] In no way do we attempt to question affirmative action efforts by employers. Rather, we believe that this activity by McDonald lacked sufficient substantive and procedural safeguards to insure that all employees would be treated fairly.

Therefore, the judgment of the district court is affirmed.

---

We reject this contention. The relevant analysis under Title VII is the intent of the person making the hiring decisions. McDonald's testimony simply indicates that he was not aware of the percentage of minorities in the local labor force. Tr. at 192. Nor did McDonald make himself aware of the differences in the percentage of minority employees during the relevant period of time. Tr. at 195. While a particular affirmative action decision may be consistent with the spirit of the *Weber* decision, we believe that the substantive and procedural safeguards discussed in *Weber* must be part of the affirmative action process. In this way, safeguards and checks are built into the system to insure fairness and consistency. *Cf. Cohen v. Community College of Philadelphia*, 484 F.Supp. 411 (E.D.Pa.1980) (although plan not temporary is legal under *Weber* because plan required submission of evidence and reports to college president on consideration of minority employees).

17. Many of the cases cited to us by Yellow Freight pertain to issues which we need not dispose of in the context of this case. The thrust of the briefs filed for this appeal is over the permissibility of the Yellow Freight plan structured by the national office. As is clear from our entire discussion, on this factual record we simply need not decide the legality of Yellow Freight's plan. Thus, many of the issues presented in the briefs as to the meaning of *Weber* must be put aside to another day.

18. We also note that this is not a case where the person who made the decision to hire was ordered by a superior to hire a minority employee and where the superior had knowledge and acted pursuant to an affirmative action plan. In such cases the knowledge of the superior may be imputed to the individual doing the hiring. On this record defendant simply has not demonstrated that McDonald acted pursuant to an affirmative action plan.