**WILMINGTON FIREFIGHTERS LOCAL 1590, et al., Plaintiffs,**

v.

**CITY OF WILMINGTON, et al., Defendants.**

Civ. A. No. 84–400–JJF.

United States District Court, D. Delaware.

April 4, 1986.

See also, D.C., 109 F.R.D. 89.

Sheldon N. Sandler, and Barry M. Willoughby, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiffs.

Frederick H. Schranck, City Solicitor's Office, Wilmington, Del., for defendant City of Wilmington Fire Dept.

Gary W. Aber, of Heiman & Aber, Wilmington, Del., for defendant Wilmore.

## OPINION

FARNAN, District Judge.

Plaintiffs brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Jurisdiction over plaintiffs' claims is conferred by 42 U.S.C. § 2000e–5 and by 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391, and 42 U.S.C. § 2000e–5(f). Plaintiff, Dennis M. Kirlin, alleges that the Defendant City of Wilmington (hereinafter "the City") unlawfully denied him and other white firefighters the opportunity for promotion on account of their race, by altering its 1984 promotion testing procedures for the race-based purpose of increasing the number of minority firefighters on the promotion list, in order to comply with the City's interpretation of the consent decree entered in *Wilmore, et al. v. City of Wilmington*, Civil Action No. 80–76 (D.Del. June 14, 1983). Currently before the Court are Plaintiffs' and Defendants' Cross Motions for Summary Judgment.

## BACKGROUND

Plaintiff, Dennis M. Kirlin, is an employee of the Defendant City and currently holds the rank of Firefighter in the City's Fire Department. Plaintiff Wilmington Firefighters Local 1590, International Association of Firefighters (hereinafter "Local 1590"), is the collective bargaining representative of the uniformed employees of the Wilmington Fire Department. Both Kirlin and Local 1590 filed timely charges of employment discrimination with the Equal Employment Opportunity Commission, and received notices of right to sue. Second Amended Complaint, Docket Item ("D.I.") 59. Kirlin is the representative plaintiff of the class of all present and future uniformed employees of the Fire Department whose position on the 1984 promotion list or on future lists was or may in the future be adversely affected by the City's interpretation of its obligations under the *Wilmore* consent decree.[1]

The Defendant City of Wilmington is an incorporated municipality in the State of Delaware, and the Fire Department is a department within the City. Defendant James Wilmore, et al. (hereinafter "the *Wilmore* class"), is the Plaintiff class in *Wilmore, et al. v. City of Wilmington*, Civil Action No. 80–76.[2]

In their Second Amended Complaint, Plaintiffs requested this Court to: (1) preliminarily and permanently enjoin the City from using the 1984 promotion testing procedures to award promotions, and to direct the City to promote candidates based on the procedures originally outlined in the City's general notices 84–2 through 84–8; (2) award Plaintiffs general and compensatory damages including but not limited to lost salary and compensation, as well as any other benefits accruing to Plaintiffs

---

1. On December 10, 1985, this Court certified the following class of Plaintiffs, under Rule 23(a) and Rule 23(b)(2):

 All present or future uniformed employees of the City of Wilmington Fire Department who took the 1984 promotional exam or, who are eligible for future promotional exams, whose position on the 1984 promotion list or on any future promotion lists was or may in the future be affected by the City of Wilmington's interpretation of its obligations under the consent decree in Wilmore v. City of Wilmington, Civil Action No. 80–76, to require alteration of the scoring system of promotional examinations for the purpose of increasing the number or percentage of minority promotions. The Plaintiff class, however, shall not include members of the *Wilmore* class in Civil Action No. 80–76.

2. The *Wilmore* class was joined by Order of this Court dated October 16, 1984. Memorandum Opinion, D.I. 26. This joinder was ordered so that the *Wilmore* class might have the opportunity to protect any interests it claims in this action, and to avoid any risk of inconsistent obligations to the City. Plaintiffs seek no relief against the *Wilmore* class. Second Amended Complaint, D.I. 59.

and members of the Plaintiffs' class as a result of the City's actions; and (3) award Plaintiffs prejudgment and post-judgment interest, attorneys fees and costs.

## THE WILMORE CONSENT DECREE

In *Wilmore*, a class of Black and Hispanic firefighters challenged the Wilmington Fire Department's 1978 and 1980 promotional examinations.[3] This Court found that the Plaintiffs had not shown that the 1978 and 1980 tests had a disparate racial impact. 533 F.Supp. at 859. On appeal, the Third Circuit reversed, stating:

> We hold that the racially discriminatory assignment of 'administrative jobs' affected the results of the 1978 and 1980 promotional tests in favor of white firefighters and to the detriment of minority firefighters. Therefore, we find that these tests significantly contributed to the disparate impact of the 1978 and 1980 promotion procedures in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §§ 1981 and 1983.

699 F.2d 667, 668 (3rd Cir.1983).

The Third Circuit remanded the case to this Court, with instructions to grant Plaintiffs' Petition for declaratory relief, injunctive relief, and damages. *Id.* at 675. However, prior to the scheduled relief hearing, the *Wilmore* plaintiffs and the City entered into settlement discussions. A settlement was reached, resulting in a proposed Consent Decree. Paragraph 16 of this Consent Decree, at issue in this litigation, provides as follows:

> 16. *Future Promotional Examination.* The City of Wilmington, hereby agrees and certifies that all future promotional exams and procedures shall afford all minority members of the City of Wilmington Fire Department full, complete, fair and equal promotional opportunities in keeping with 42 U.S.C. §§ 1981, 1983, and 2000(e), *et seq.*, and the Wilmington Charter, and that such promotional exams and procedures shall not result in a disparate impact on minorities. Disparate impact shall, for the

purposes of this compromise and settlement be considered to have occurred if the minority test taker promotional rate shall at any time be less than 80% of the white test taker promotional rate, as disparate impact is defined by the 'Uniform Guidelines and Employment Selection Procedures' (1978); 29 C.F.R. § 1607.-4(d). Alternatively, disparate impact will be considered to have occurred if the probability of the distribution of minority members, on any promotional lists, of the City of Wilmington Fire Department shall be less than 5%, when compared to the distribution of white firefighters (notwithstanding the above, disparate impact will not be assumed if the comparison of promotional rates results yield an expected number of minority promotions less than one whole promotion without rounding up).

A fairness hearing on the Consent Decree was held on June 6, 1983. In a Memorandum Opinion dated June 14, 1983, this Court approved the proposed Consent Decree.

## THE CITY'S PROMOTIONAL EXAMINATIONS

On March 28, 1984, the City issued General Notices 84-2 through 84-8, outlining procedures for the first Fire Department promotion tests following the *Wilmore* Consent Decree. General Notice 84-3 described the following examination procedure and scoring process:

> 2. All eligible candidates who desire to participate in the promotion process will take two (2) components:
> —Administrative/Management Task Analysis (AMTA)
> —Problem Analysis and Presentation (PAP)
> These are described in separate General Notices.
> 3. Based on the performance of candidates as per point 2, the board of examiners will certify candidates as per the following groups:

---

3. This Court's decision is reported at 533 F.Supp. 844 (D.Del.1982).

(a) Well qualified for further consideration.

(b) Qualified for consideration.

(c) Not qualified at this time.

4. All candidates certified by the board of examiners in the top category (well qualified for further consideration) will have an interview and record appraisal with the Chief of Fire. This component would include job-related questions and a review of the candidate's record up to the interview date. The Chief of Fire, as in previous years, will not have knowledge of anyone's performance on the PAP and AMTA.

5. After completion of the Chief's interview phase, the board of examiners will calculate candidates' scores using this framework:

—PAP (60%)

—AMTA (25%)

—Interview/Record Appraisal (15%)

6. In the event of ties, a candidate's experience factor will be used. See General Notice 84–8 for the method used to calculate one's experience factor. This is identical to the method used in previous years.

7. The promotional process is subject to the requirements of the Consent Decree approved by U.S. District Court Judge Walter K. Stapleton on June 14, 1983, in *Wilmore, et al. v. City of Wilmington, Local 1590, I.A.F.F.* The board of examiners will see to it that the promotional process will be carried out in accordance with the terms of the Decree.

Second Amended Complaint, Exhibit C, D.I. 59. General Notice 84–4 outlines the scoring process employed by the board of examiners:

A. They shall calculate the component scores of each candidate on the problem analysis and presentation component, and the administrative/management task analysis component. From this will be derived an alphabetical listing of candidates in each of three groups: (a) Well qualified for further consideration; (b) Qualified for further consideration; (c) Not qualified for consideration at this

time. Candidates will be notified by the board of examiners as to their classification in these groups.

B. Candidates in the top group (well qualified for further consideration) will have a job-related interview and record appraisal with the Chief of Fire. Results from this component will be tabulated by the board of examiners with scores on the previous components yielding a certified list of eligibility for promotion for the ranks of lieutenant, captain and battalion chief.

C. The board of examiners will be responsible for compliance with the Consent Decree in *Wilmore, et al. v. City of Wilmington, Local 1590, I.A.F.F.* approved June 14, 1983.

D. The certified list of eligibles will be used for filling promotions until the list is exhausted or until two years from the date of filing the certified list.

Second Amended Complaint, Exhibit C, D.I. 59.

The AMTA and PAP components of the 1984 examinations were administered in May and June, 1984. After the results were computed, the Board of Examiners met to determine which candidates would be in the Well Qualified group, and thus be eligible to move on to the interview component of the exam. The board considered and rejected a "top down" scoring system, under which a numerical rank would be assigned to each candidate for promotion based on the total of his PAP and AMTA scores combined. Deposition of Deputy Chief William Maichle, D.I. 22, at 51. Instead, the board adopted a "threshold" scoring system, based on a minimum threshold score on each of the two components. Under this system, each candidate had to receive a minimum score of 6.0 on the PAP and the minimum of 2.0 on the AMTA in order to advance to the interview. Second Amended Complaint, Exhibit D, D.I. 59. One of the reasons put forward by the Board for adopting a threshold scoring system and rejecting top down ranking was that a top down ranking of the test scores reflected a significant disparate impact on minority firefighters, as defined in para-

graph 16 of the *Wilmore* Consent Decree. Maichle Deposition, D.I. 22, at 51–52.[4] Under the threshold system adopted, test takers with scores falling below either of these minimum scores were excluded from the Well Qualified group, and thus did not proceed to the Chief's interview, regardless of their combined PAP and AMTA scores.

The City's testing expert, Dr. Barry R. Morstain, had "no explanation" for the lower average PAP and AMTA scores of minority candidates for promotion to lieutenant since, in his opinion, the tests were valid and job related. Dr. Morstain developed the tests by performing a job analysis, in which Fire Department officers answered questionnaires dealing with the various tasks they performed on the job. Dr. Morstain noted two major categories of job functions. The first involved knowledge of correct procedures in fire fighting situations, while the second category involved knowledge of administrative and management procedures. Dr. Morstain designed the PAP and AMTA components to test for the types of knowledge the officers considered to be important in these two categories. Morstain Deposition, D.I. 29, at 22–23. Dr. Morstain stated that the threshold ranking system that he adopted was the only ranking system that was able to satisfy the minority pass rate requirement and still was valid and job related. *Id.* at 87.

## THE FINAL PROMOTION RANKINGS

Candidates in the Well Qualified group went on to the interview stage. At the completion of all the interviews, the Board met again on June 14, 1984, to determine the final promotion list rankings. Dr. Morstain concluded that, if the list were calculated based on the framework outlined in General Notice 84–3, there would again be a significant disparate impact on minority candidates, as defined in paragraph 16 of the Consent Decree.[5] Morstain Deposition, D.I. 29, at 94. Therefore, the City decided to abandon the original top down ranking system in favor of a minimum threshold system, similar to that used to determine the Well Qualified group. Under this framework, the City set up three "eligible categories" within the Well Qualified group, based on scores from the interview and PAP. The AMTA results were abandoned entirely, and a total of 18 possible points were assigned to the interview. Placement of candidates within the eligible categories was made based upon the following minimum threshold scores:

1. First Eligible Category—PAP: 7.0; Interview: 16.

2. Second Eligible Category—PAP: 6.0; Interview: 14.

3. Third Eligible Category—PAP: 6.0; Interview: 8.

Morstain Deposition, D.I. 29, at 95–100; Second Amended Complaint, Exhibit D, D.I. 59. According to Dr. Morstain, the AMTA score was not used at this stage because it had already been incorporated in determining the Well Qualified group, and

4. The statistical computations of disparate impact were performed by the City's testing expert, Dr. Barry R. Morstain of the University of Delaware. In performing his calculations for determining the well qualified group, Dr. Morstain separated the test results by the rank sought. For the firefighter to lieutenant rank, the threshold approach yielded a minority promotion pass rate of 75% of the white rate; that is, 56% of minority test takers passed, whereas 75% of white test takers passed. Dr. Morstain considered this result to be statistically close enough to the Consent Decree goal of a minority pass rate of 80% of the white pass rate to be acceptable. For the lieutenant to captain rank, the white pass rate was 76%, while the minority pass rate was 83%, somewhat higher than the white rate. In contrast, a simple summation of

each test taker's AMTA and PAP scores revealed an average score of 9.76 for white test takers, and an average of 8.80 for minority test takers. Dr. Morstain considered this to be "a statistically significant difference in the average score between whites and minorities." Deposition of Barry R. Morstain, D.I. 29, at 70, 66–71.

5. Dr. Morstain stated that he did not perform a new computer analysis of the test results at this stage. Rather, upon visual examination of the data, he determined that the results of the previous stage, reflecting a minority pass rate less than 80% of the white pass rate, would not be materially affected by the interview scores. Morstain Deposition, D.I. 29, at 94.

because the PAP score was considered to be a more important measure of the test takers' abilities. Morstain Deposition, D.I. 29, at 96; Maichle Deposition, D.I. 22, at 68–70.[6] In the first eligible category, the threshold score of 16 on the interview was chosen because it approximated 90% of the possible points available on that component, while the score of 7.0 on the PAP was considered to be between "good and excellent" on that component. In the second eligible category, the minimum interview score of 15 approximated 80% of possible points available, while 6.0 on the PAP denoted "good performance". Morstain Deposition, D.I. 29, at 99–100. Candidates were then ranked within each grouping based on their PAP scores. *Id.* at 99.

Dr. Morstain determined that this ranking system did not result in disparate impact on minority test takers. He determined this by comparing white and minority membership in the three eligibility categories. He determined that 44.4% of all white well qualified candidates were placed in the first eligible category, while the ratio for minorities was slightly higher, at 46.7%. The second eligible category contained 38.1% of white well qualified candidates, compared to 33.3% of the minorities. The third eligible category contained 17.5% of white well qualified candidates, compared to 20% of minority candidates. Morstain Deposition, D.I. 29, at 101.

### THE EFFECTS OF THE REVISED SCORING PROCESS

As a result of the City's alteration of the procedures outlined in General Notice 84–3 for determining the final promotion rankings, members of the plaintiff class rank lower on the final promotion list than they would have under a top down ranking based on total score. Appendix to Plaintiffs' Opening Brief in Support of their Motion for Class Certification, D.I. 66A, at 54–61; Maichle Deposition, D.I. 22, at 105–106. For instance, plaintiff Kirlin correctly

answered twenty out of a possible twenty-one questions on the AMTA, and received the highest possible score on the PAP. However, because he received an interview score of only 13, under the City's revised process, Kirlin was placed in the third eligible category. Thus, he ranks only forty-first overall on the promotion list. Kirlin alleges that had the ranking of candidates been based on the sum of weighted PAP, AMTA, and interview scores at both stages of the scoring process, his computations indicate that he would have been ranked seventh. Appendix to Plaintiffs' Opening Brief in Support of their Motion for Class Certification, D.I. 66A, at 56.

### DISCUSSION

### I. SUMMARY JUDGMENT.

Plaintiffs and defendants have filed cross motions for summary judgment. Summary judgment, under Rule 56(c), is appropriate only where there is no genuine issue of material fact, and the moving parties are entitled to judgment as a matter of law. *Federal Laboratories, Inc. v. Barringer Research Ltd.*, 696 F.2d 271, 274 (3rd Cir.1982). The parties are in agreement as to the above stated facts, and that no other material facts are in dispute.

### II. FIREFIGHTER'S LOCAL UNION NO. 1784 v. STOTTS.

Plaintiffs' first argue that the City's actions in revising the test scoring procedures are impermissible under *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Plaintiffs argue that *Stotts* forbids a public employer, such as the City, from affording a race based preference to anyone other than specific, individual victims of discrimination. They argue that the revised, threshold scoring system adopted by the City benefits minority employees as a group, and not specific victims, as required

---

6. According to Deputy Chief Maichle, the information tested in the AMTA was contained in the "Officer's Guidebook", and an officer could "always refer to this book to properly complete a

form or a memo.... That was one of the reasons that we felt that we won't go back and include the AMA again ..." Maichle Deposition, D.I. 22, at 69–70.

by *Stotts*. Thus, they argue that the threshold scoring system is impermissible under Title VII, whether or not authorized by the Consent Decree.[7]

In *Stotts*, black employees of the Memphis, Tennessee, Fire Department brought suit in 1977 charging the Fire Department with discrimination in hiring and promotion decisions, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1981 and 1983. In 1980, prior to trial, a Consent Decree was entered requiring the City of Memphis to grant back pay and promotions to certain individuals, and to implement an affirmative action plan to increase the proportion of minority employees in its Fire Department. However, the City did not admit that plaintiff's allegations of discrimination were true.

In 1981, the City announced that layoffs would be required because of fiscal problems. These layoffs were to be conducted under the City seniority system's "last hired, first fired" rule. At plaintiff's request, the District Court entered an injunction preventing the City from applying the "last hired, first fired" rule to the extent that it would decrease the percentage of blacks then employed in certain positions. The court ordered this action as a result of its conclusion that the City's seniority system was not bona fide, and that the proposed layoffs would have a discriminatory effect on blacks. 104 S.Ct. 2576, 2582.

On appeal, the Sixth Circuit affirmed, but disagreed with the District Court's finding that the City's seniority system was not bona fide. 679 F.2d 541, 551 n. 6 (6th Cir.1982). The Court of Appeals held that the District Court's injunction enforced the terms of a valid consent decree and, in any event, was a valid modification of that decree. *Id.* at 561–64.

The Supreme Court reversed. At issue in the case, according to the Court, was "whether the District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority." *Stotts*, 104 S.Ct. at 2585 (footnotes omitted).

The Court first rejected the Sixth Circuit's holding that the District Court was merely enforcing the terms of the consent decree. The Court stated that "the scope of a consent decree must be discerned within its four corners", and that the decree here made no mention of layoffs or demotions, and contained no express provision stating any intention to depart from the seniority plan. *Id.* at 2586. The Court also rejected the Sixth Circuit's conclusion that the injunction was a proper modification of the consent decree, even though the modification conflicted with a bona fide seniority system. The Court noted that Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), immunizes a bona fide seniority system from challenge under Title VII, absent proof of an intention to discriminate. *Stotts*, 104 S.Ct. at 2587. Citing *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Court stated that: (1) individual members of a class may be awarded competitive seniority if they have been actual victims of discrimination; and (2) even where an individual has been discriminated against, he is not automatically entitled to the displacement of a non-minority employee to make room for him. *Stotts*, 104 S.Ct. at 2588. The court stated that since there was no finding in that case that the blacks protected from layoff had been victims of discrimination, and that since no blacks had

---

7. To the extent that plaintiffs challenge the legality of the City's actions under *Stotts*, irrespective of whether those actions are in accord with the Consent Decree, their challenge might be construed as a collateral attack on the Consent Decree, if in fact the City acted in compliance with the Consent Decree. *See O'Burn v. Shapp,* 70 F.R.D. 549, 552–53 (E.D.Pa.), *aff'd,* 546 F.2d

418 (3rd Cir.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977); *Prate v. Freedman,* 430 F.Supp. 1373 (W.D.N.Y.), *aff'd,* 573 F.2d 1294 (2nd Cir.1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978). However, in light of the court's interpretation of the Consent Decree, *infra,* this issue need not be reached.

been awarded competitive seniority, the Sixth Circuit had "imposed on the parties as an adjunct of settlement something that could not have been ordered had the case gone to trial and the plaintiffs proved that a pattern or practice of discrimination existed." *Id.* at 2588.

The Court also stated that the *Teamsters* holding, that competitive seniority can be awarded only to actual victims of illegal discrimination, was consistent with the policy behind Section 706(g), 42 U.S.C. § 2000e–5(g), which limited "make-whole relief only to those who have been actual victims of illegal discrimination." *Stotts,* 104 S.Ct. at 2589.

Under the interpretation given *Stotts* by the Third Circuit, as well as by other circuits, *Stotts* does not apply to this case. Each circuit that has considered the scope of *Stotts* has read that case narrowly to prohibit courts from modifying consent decrees, entered without a judicial finding of discrimination, in a manner which overrides a bona fide seniority system. *See Commonwealth of Pennsylvania v. Local Union 542, International Union of Operating Engineers,* 770 F.2d 1068, *opinion reported at* 38 F.E.P. Cases 673, 675 (3rd Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 803, 88 L.Ed.2d 779 (1986); *Kromnick v. School Dist. of Philadelphia,* 739 F.2d 894, 911 (3rd Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *Turner v. Orr,* 759 F.2d 817, 824 (11th Cir.1985); *E.E.O.C. v. Local 638 ... Local 28 of Sheet Metal Workers Int'l Assoc.,* 753 F.2d 1172, 1186 (2nd Cir.), *cert. granted,* — U.S. —, 106 S.Ct. 58, 88 L.Ed.2d 47 (1985); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 486–93 (6th Cir.), *cert. granted,* — U.S. —, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985); *Diaz v. American Telephone and Telegraph Co.,* 752 F.2d 1356, 1360 n. 5 (9th Cir.1985); *Grann v. City of Madison,* 738 F.2d 786, 795 n. 5 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 296, 83

L.Ed.2d 231 (1984); *Deveraux v. Geary,* 765 F.2d 268, 271–75 (1st Cir.1985).

Unlike *Stotts,* this case involves judicial findings of intentional discrimination. In *Wilmore v. City of Wilmington,* 699 F.2d 667 (3rd Cir.1983), the Third Circuit reversed this Court's judgment that the City's Fire Department promotion procedures did not discriminate against minorities. The Court found that the City's promotion tests "significantly contributed to the disparate impact of the 1978 and 1980 promotion procedures in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983." *Wilmore,* 699 F.2d at 668. The Consent Decree was then entered as a remedy for the violations of statutory rights found by the Third Circuit.

Cases such as this, where there has been intentional discrimination, stand on a different footing from cases such as *Stotts,* where race conscious action is taken without any such finding. As noted by Justice Powell in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978):

> After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit.

*Id.* at 307–08, 98 S.Ct. at 2757 (Opinion of Powell, J.).[8]

Where such a finding is present, race conscious relief will often be necessary to remedy the effects of the violation, even though in the absence of the violation, such relief would appear to be merely a preference of one race over another. *See EEOC v. American Telephone and Telegraph*

---

**8.** The Constitutional analysis outlined in *Bakke* has been applied in Title VII cases as well. *See,*

e.g., *Janowiak v. City of South Bend,* 750 F.2d 557, 561 (7th Cir.1984).

Co., 556 F.2d 167, 179–80 (3rd Cir.1977). For these reasons, the Third Circuit has specifically refused to apply *Stotts* to cases such as this where there has been a finding of intentional discrimination. *Local 542, Operating Engineers*, 770 F.2d 1068, 38 F.E.P. Cases at 675–76. *See also Grann*, 738 F.2d at 795 n. 5.

■ Also, unlike *Stotts*, Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), is not implicated by the City's actions here. In pertinent part, Section 703(h) provides that it is not unlawful:

> To give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results, is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(h).

Section 703(h) thus prohibits the Court from ordering the override of a bona fide merit or seniority system, or ability test, in the absence of a finding that the system itself was designed or intended to discriminate. *Stotts*, 467 U.S. 561, 104 S.Ct. at 2587. However, nothing in Section 703(h) forbids an employer, such as the City, from voluntarily altering an ability test.[9] Although, as discussed *infra*, plaintiffs' statutory or constitutional rights might be otherwise infringed by the City's action, Section 703(h) is irrelevant. Therefore, *Stotts*, which dealt only with the authority of a court to override a bona fide seniority plan in light of 703(h), is inapplicable.[10]

### III. THE CITY'S OBLIGATIONS UNDER THE WILMORE CONSENT DECREE.

The City argues that the terms of the Consent Decree, as well as *Albemarle Pa-*

per Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), required it to revise its test scoring procedures when disparate impact on minorities was shown.

Under the terms of ¶ 16 of the Consent Decree, the City agreed that future promotion testing procedures in the Fire Department "shall not result in a disparate impact on minorities," with disparate impact defined as a minority test taker promotional rate of less than 80% of the white rate. Consent Decree, ¶ 16. In interpreting its obligations under ¶ 16, the City relies on *Albemarle Paper Co. v. Moody*, in which the Supreme Court set forth the analysis to be used in disparate impact cases under Title VII:

> In *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), this court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] ... a manifest relationship to the employment in question.' *Id.* at 432 [91 S.Ct. at 854]. [Footnote omitted]. This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, i.e., has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would

**9.** Plaintiff Local 1590 does not allege that the City's action violated any collective bargaining agreement it has with the City. *See W.R. Grace and Co. v. Local 759*, 461 U.S. 757, 771, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983).

**10.** The Supreme Court has granted certiorari in *Wygant v. Jackson Board of Education*, 746 F.2d 1152 (6th Cir.), *cert. granted*, —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985), to address the

propriety under Title VII of voluntary affirmative action programs adopted without a judicial finding of discrimination, a question specifically left open in *Stotts*. 104 S.Ct. at 2590–91. This question is not presented in this case, since here there has been a finding of discrimination under Title VII, as well as Section 1981 and Section 1983. *See Bakke*, 438 U.S. at 307–09, 98 S.Ct. at 2757–58.

also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' *Id.* at 801 [93 S.Ct. at 1823]. Such a showing would be evidence that the employer was using its tests merely as a 'pretext' for discrimination. *Id.,* at · 804–05 [93 S.Ct. at 1825–26].

*Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375.

Here, the City determined that disparate impact was shown under a top down ranking method at both the point where the "Well Qualified" group was chosen, as well as the point where the final promotion list was compiled.[11] In both instances, the City itself then derived alternative scoring methods, which the City admits served its interest in promoting only qualified candidates, but which did not result in disparate impact on minority candidates. Under the City's interpretation of *Albemarle Paper Co.,* the continued use of a scoring system with disparate impact on minorities when such a non-discriminatory, job related alternative system was available would have necessarily meant that the City was employing the original system as a "pretext" for discrimination against minorities. *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375. Thus, the City argues that it was "compelled" to adopt the revised scoring system.

This argument is based on a misinterpretation of *Albemarle Paper Co.* In the portion of that case cited by the City, the Supreme Court clarified the three part analysis first outlined in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), for determining when use of a particular employment test violates Title VII. This three part analysis is as follows:

**11.** The disparate impact analysis was conducted at both points in the testing procedure pursuant to the dictates of *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). There, the Supreme Court ruled that Title VII guaranteed individuals equal employment opportunities, at any stage of the hiring or promotion process, regardless of the final "bottom

To establish a prima facie case of discrimination, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question' in order to avoid a finding of discrimination. *Griggs, supra,* at 432 [91 S.Ct. at 854]. Even in such a case, however, the plaintiff may prevail, if he shows that the employer was using · the practice as a mere pretext for discrimination. *See Albemarle Paper Co., supra,* [422 U.S.], at 425 [95 S.Ct. at 2375]; *Dothard, supra,* [433 U.S. 321] at 329 [97 S.Ct. 2720 at 2726–2727, 53 L.Ed.2d 786 (1977)].

*Teal,* 457 U.S. at 446–47, 102 S.Ct. at 2530.

█ In the quoted portion of *Albemarle Paper Co.,* the Supreme Court merely stated that, even when an employer shows that a test with a disparate impact on minorities is job related, a plaintiff still has the opportunity to show that other job related tests without such an impact are available. Such a showing by a plaintiff "would be evidence that the employer was using its tests merely as a 'pretext' for discrimination". *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375. However, the court did not state, as the City seems to suggest, that availability of such tests would raise a conclusive presumption of a pretext for discrimination. Rather, such tests are merely evidence of pretext, which the court would consider along with other evidence in determining whether such pretext existed. *Id.* Therefore, upon discovering such alternatives in this case, the City was not in any way compelled, as a matter of law, to adopt them.

The City also misinterprets the provisions of ¶ 16 of the Consent Decree.[12]

line" racial composition of the relevant work force. *Id.* at 448–50, 102 S.Ct. at 2531–32.

**12.** As discussed *supra,* to the extent that the issue before us is the City's *compliance* with the Consent Decree, this action is not a collateral attack on the Decree itself. Plaintiffs allege that the City discriminated against them because of their race. The City defends by asserting compliance with the Decree. Thus, the only issue

Paragraph 16 does not, in explicit terms, provide that the City must revise testing procedures when disparate impact on minorities is shown. Rather, the City argues that this authority is derived from the provision in the Decree that "promotional exams and procedures shall not result in disparate impact on minorities." Consent Decree, ¶ 16. The City interprets this provision as a directive to unilaterally alter testing procedures at any time such impact is shown.

■ Ordinarily, in interpreting a Consent Decree, a court may not depart from the "four corners" of the Decree itself. *United States v. Armour & Co.*, 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). However, where the terms of the Decree are ambiguous, the court may look to the surrounding circumstances of the Decree's formation to determine the Decree's purpose. *See United States v. I.T.T. Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *Brown v. Neeb*, 644 F.2d 551, 562 (6th Cir.1981).

■ Here, the discussion between Judge Stapleton and counsel for the City and the *Wilmore* plaintiffs at the fairness hearing on the Decree belies the City's interpretation of ¶ 16's provisions. At that hearing, the following colloquy took place:

THE COURT: Let me ask you for a clarifying comment. ...

I am unclear what the parties contemplate if, heaven forbid, a situation should arise in which those formulas light up and say, disparate impact, in other words, the agreement does not specifically identify the consequences if there sometime in the future being an exam which doesn't meet the criteria set forth in the agreement....

MR. ABER: It was our intention, based upon consultation with other attorneys in the field, that, obviously, any injunctive relief had to include any injunction that

you shall not discriminate in the future. That left us open.

Let's say in the future we got another result such as the '78 with no minority promotions. We are right back, let's say, in 1990 where we were in '78 and we have got to start a whole new litigation all over again.

You want to try and eliminate that. Hopefully, that won't happen. And the City is fairly confident that it won't, given the numbers of increasing minorities.

But if in the unfortunate circumstance it did, the plaintiff class, in the same way in the City desegregation suits, they didn't want to have to be right back where we started in '78 all over again in 1990.

*The purpose of this paragraph is that it sort of short cuts the litigation process. In the typical Title VII or even S1983 litigation, you have a three step analysis. First is there disparate impact, then is there reasonable explanation why, and then it goes back to the plaintiff, is there a less onerous method. This merely eliminates the first hurdle that the plaintiff must overcome, as in this very litigation.*

*Your Honor, in the initial Opinion, said we didn't meet that first test, we did not prove disparate impact. Here we are setting specific numbers which the City and the plaintiffs are agreeing to that if this occurs, there is disparate impact, and then the burden would fall upon the City to explain why it happened.*

So I guess what it does, if this test is met in the future, and disparate impact, we would come to the Court, since it is our anticipation that this will be an Order of the Court, say, Your Honor, we are now in the middle of a law suit, we have proven disparate impact, the City must explain away the reasons for that disparate impact.

---

before the Court is whether the City's actions were in fact in compliance with the Decree. To decide this, I need not alter or modify the De-

cree, nor do I place the City under inconsistent obligations. *Harmon v. San Diego County*, 477 F.Supp. 1084, 1091 (S.D.Cal.1979).

THE COURT: All right. *So the answer to my question is the parties contemplate that there will be further judicial proceedings, and that in that judicial proceeding the Court would have to take it as given that there was a disparate impact of the exam?*

MR. ABER: *Exactly.*

THE COURT: All right. Thank you. Mr. Schranck, that conforms to your understanding of the intent?

MR. SCHRANCK: *It does, Your Honor.* Not only, heaven forbid, but if the City has anything to do with it, the City will forbid it to happen. There is protection for us in the parenthetical statement in paragraph 16 that if the expected number of minority promotions is less than one whole person, without rounding up, that would be in the instance where there are so few openings that there are very few promotions made, and it just turns out that there were three white promotions, say, and no Hispanic promotions and no black promotions, it does not eliminate the opportunity of the City to justify the validity of the testing system that it uses at that time. It merely, again, as Mr. Aber said, sets up the given that there is impact. And plaintiffs still have the same opportunity as they would have in any other case to prove a less onerous, yet feasible, alternative to whatever system that we have come up with.

So, to that extent, it's a little bit better, on behalf of the plaintiffs, than simply our statement that we would no longer violate Title VII. It gives them one potential leg in the Courthouse door toward any potential problems in the future, which we do not contemplate happening.

Fairness Hearing Transcript, *Wilmore v. City of Wilmington,* C.A. 80–76, at 26–30. (Emphasis added).

As is clear from this interchange, ¶ 16 of the Consent Decree is meant simply to relieve the *Wilmore* class of the burden of proving a prima facie case of discrimination in future litigation over promotional tests. Counsel for the City and for the *Wilmore* class both agreed that ¶ 16 contemplated such future litigation, should disparate impact be shown on promotion tests. As counsel for the *Wilmore* class stated, ¶ 16 merely "short cuts the litigation process." Disparate impact is defined as a minority test taker promotion rate of less than 80% of the white rate. If, in any promotional test, this level is not achieved, then, in any litigation it should initiate, the *Wilmore* class will be deemed to have met its prima facie burden of showing disparate impact, and the burden will be shifted to the City to show that the test is job related. If the City meets this burden, then of course the *Wilmore* class would still have the burden of showing pretext. As the parties to *Wilmore* understood, paragraph 16 does not require the City to unilaterally change the testing procedures in mid-stream, even where, as here, the City determines that disparate impact will result pursuant to the announced testing procedure, and an alternative testing procedure is available.

This interpretation might, on a cursory reading, appear too narrow; however, it is compelled in view of the remedial purposes of the Consent Decree and the continuing responsibility of this Court to insure that the terms of the Decree are effectuated. *See Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 562–63 (6th Cir.1982), *rev'd on other grounds,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). As the City itself correctly notes, the Consent Decree at issue is entered for the benefit of the *Wilmore* class, who had successfully challenged the City's past promotional practices. The City's obligation under the Decree is merely to administer its promotion tests, under its announced procedures. Once the test is administered, its only obligation is to announce the results. This obligation does not change, even if disparate impact is shown. If such impact is shown, however, the *Wilmore* class, as discussed above, has the option of instituting suit against the City, receiving the benefit of a prima facie case as provided by ¶ 16. Thus, since the procedure provided for remedying the discrimination is such a lawsuit by the *Wilmore* plaintiffs, this Court will retain its authority to approve appropriate remedies.

Also, since the Court's participation is necessary under ¶ 16, the remedial process will be more orderly than if the City undertakes unapproved, unilateral action.

## IV. THE EFFECT OF THE CITY'S ACTIONS UNDER TITLE VII.

Given that the City's actions in altering the test scoring procedures were not authorized by the Consent Decree, the Court must still determine whether these actions in any way infringed plaintiffs' rights.

 The question to be decided in any Title VII case is whether the employer intentionally discriminated against the plaintiffs; that is, whether it treated the plaintiffs less favorably because of their race, color, religion, sex or national origin. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1977). The plaintiff bears the ultimate burden of persuasion on this issue. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. In this case, since the material facts are not in dispute, this ultimate issue is now properly before the Court. *United States Postal Service v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).[13]

At issue in this case is the City's action in revising its test scoring procedures once it was apparent that disparate impact on minorities would result if the announced testing procedures were maintained. This action was performed at two separate stages in the scoring process—first, at the determination of the "Well Qualified"

group and, secondly, at the final ranking. At the first stage, the City had not announced that scoring would be conducted according to any specific procedure. At this stage, the City considered a scoring procedure involving top down ranking, but finally adopted the threshold system outlined *supra*. At the scoring stage, the City previously announced in its General Notices that, in determining the final rankings, a top down scoring system involving different weights for each test component would be used. This original system was abandoned in favor of the threshold system when it became apparent that the original system would result in disparate impact at this stage, as well.

It is undisputed that, at each stage, the City scored the tests in the way it did for the specific purpose of avoiding disparate impact on minority test takers, and that, but for such disparate impact, the final rankings would be determined by adding the three components together and scoring the candidates in top down, rank order. It is also undisputed that the members of the plaintiff class ranked lower on the City's final promotion list under the revised method than they would have under a top down, total score ranking, and that their chances of promotion were thereby reduced.

Since these actions were not authorized by the *Wilmore* Consent Decree, they are best characterized as voluntary, race conscious, affirmative action. In *United Steel Workers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court held that such race conscious affirmative action plans are not prohibited by Title VII.[14] The court held

---

**13.** Therefore, at this stage of the proceedings, the familiar three part framework outlined in *McDonnell Douglas* for allocating presentation of evidence need not be applied. *See McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25; *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854.

**14.** I note that there is some dispute in the case law as to whether informal affirmative action decisions, not conducted according to an organized "plan", are permissible under *Weber. See Lehman v. Yellow Freight System, Inc.*, 651 F.2d 520, 525–28 (7th Cir.1981); *Meyers v. Ford Mo-*

*tor Co.*, 480 F.Supp. 894, 899 n. 5 (W.D.Mo. 1979); *Harmon v. San Diego County*, 477 F.Supp. 1084, 1089–90 (S.D.Cal.1979). In *Harmon*, the trial court suggested that informal, race conscious decisions could never be permissible under *Weber*, since *Weber* dealt only with "plans". 477 F.Supp. at 1089. *Meyers*, however, interpreted *Weber* to "supply an umbrella for the permissive use of a wide variety of less drastic informal goals and individual acts favoring minority employment ...". 480 F.Supp. at 899 n. 5. In *Lehman*, the Seventh Circuit declined to follow any single approach, but rather

that, in light of the legislative history of Title VII, such race conscious plans are permissible as a reasonable measure "designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." *Id.* at 209, 99 S.Ct. at 2730. *See also Bakke,* 438 U.S. at 307–08, 98 S.Ct. at 2757.[15]

Although the *Weber* court declined to define "the line of demarcation between permissible and impermissible affirmative action plans", 443 U.S. at 208, 99 S.Ct. at 2729–30, it did identify certain criteria for determining whether a race conscious plan is permissible. First, the plan must be designed to "break down old patterns of racial segregation and hierarchy." *Id.* Secondly, the plan must not "unnecessarily trammel" the interests of non-minorities. *Id.* Finally, the plan must be a temporary measure, "not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *Id.* If the plan meets these criteria, then the defendant's action pursuant to that plan, though racially conscious, will not result in Title VII liability. *Id.* at 204, 99 S.Ct. at 2727–28.[16]

▇ Here, it is clear that the City's action was designed to "break down old patterns of segregation and hierarchy." *Web-*

er, 443 U.S. at 208, 99 S.Ct. at 2730. As discussed *supra,* the City was found to have intentionally discriminated against minority firefighters in its Fire Department promotion practices, and its action in revising the test scoring procedures to prevent disparate impact on these minorities was clearly aimed at eliminating this past practice of discrimination.

It is also clear that the City's action is temporary in nature. The promotion lists at issue here expire June 15, 1986, at which time new tests will be administered. Defendant's Opening Brief in Support of Their Motion for Summary Judgment, D.I. 95, at 72. Also, it is unlikely that the City will similarly misinterpret the requirements of the *Wilmore* Consent Decree in the future.

However, the City's action here "unnecessarily trammels" the interests of the individual non-minority plaintiffs. The candidates for promotion were informed that the promotion testing procedures were to be conducted according to the guidelines outlined in General Notice 84-3. The candidates, having served the required number of years to become eligible for promotion, have a reasonable, legitimate expectation

held that, applying the criteria outlined in *Weber,* the informal actions at issue "lacked sufficient substantive and procedural safeguards to insure that all employees would be treated fairly." 651 F.2d at 525 n. 10, 528.

Here, I follow the approach of the Seventh Circuit in *Lehman* in determining that this particular action, regardless of its "formality" or "informality", does not meet the *Weber* criteria. Thus, I need not decide whether informal action is impermissible *per se* under *Weber. See Harmon,* 477 F.Supp. at 1089.

**15.** As noted above, I am not here concerned with the applicability of *Weber* to public employers in the absence of judicial findings of discrimination. Since there has been a judicial finding of discrimination here, the substantial public interest in providing a remedy for such discrimination authorizes otherwise valid, race conscious affirmative action. *Bakke,* 438 U.S. at 307–08, 98 S.Ct. at 2757. Thus, the Court's only concern is whether this particular action is valid.

In any event, I note that some courts have specifically held *Weber* applicable to public em-

ployers even in the absence of such findings. *See, e.g., Bushey v. New York State Civil Service Commission,* 733 F.2d 220, 227 n. 8 (2nd Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985), and cases cited therein. *See also, Kromnick v. School District of Philadelphia,* 739 F.2d 894, 909–12 (3rd Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985) (*Weber* applied to voluntary race conscious policies of public school system).

**16.** Again, in the procedural context of this case, the undisputed facts are before the Court and I am concerned only with the ultimate issue of intentional discrimination, on which the plaintiffs bear the burden of persuasion. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481–82. Therefore, I am not at this stage concerned with the issue of whether the plaintiff or defendant bears the burden of proving the validity or invalidity of the affirmative action plan. *See Setser v. Novack Investment Co.,* 657 F.2d 962, 968–69 (8th Cir.), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Warsocki v. City of Omaha,* 726 F.2d 1358, 1360 (8th Cir.1984). I decide the validity or invalidity of the plan on the undisputed facts before me.

that the City will deal fairly with them in administering these tests. They have a legitimate expectation that the tests and promotion rankings will be conducted according to the fair and presumably valid procedures announced. The members of the plaintiff class, who would rank higher on a promotion list compiled according to these procedures than on the City's revised list, have been treated unfairly by the City's actions in unilaterally altering these procedures in the middle of the testing process, for the race based purpose of avoiding disparate impact on minority firefighters.

It is of course true, as the City argues, that the non-minority plaintiffs here cannot have a reasonable expectation of promotion according to a list that violates the *Wilmore* Consent Decree. However, whether a promotion list compiled under the originally announced procedures would in fact violate the *Wilmore* Decree is not a decision for the City to make unilaterally. As discussed *supra*, the *Wilmore* Decree was entered with specific devices designed to insure its enforcement by the Court after a full and fair review. When the Decree was approved, the parties indicated to the Court that, should a situation arise such as in this case, the parties would return to Court with a prima facie case of discrimination against the *Wilmore* plaintiffs proved. The parties did not indicate to the Court that unilateral action by the City was contemplated. It was this understanding of the Decree's remedial procedures that this Court approved. The City's obligations under ¶ 16 are merely to administer a racially blind testing procedure, not to guarantee the promotional ranking of the *Wilmore* plaintiffs to the degradation of the rights of non-minority firefighters. Thus, until such time as the *Wilmore* plaintiffs act to enforce their rights under ¶ 16, and a determination is made that the City's testing procedures discriminate against those plaintiffs, the City's testing procedures are presumably valid, and the test takers have a reasonable expectation of promotion according to those procedures. *See Hammon v. Barry*, 606 F.Supp. 1082, 1098 (D.D.C.1985).

These considerations also demonstrate why the City's action *unnecessarily* trammels the interests of non-minority firefighters. *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729–30. The *Wilmore* Consent Decree provides procedures through which the *Wilmore* plaintiffs can protect their rights. Since these judicially approved procedures already exist, there is no need for the City to take additional action, unauthorized by the *Wilmore* Decree or this Court, to promote those rights. Although one reason expressed by the City for taking such action was its desire to avoid a law suit by the *Wilmore* plaintiffs, the *Wilmore* Decree in fact specifically contemplates that such a lawsuit may be brought. In fact, litigation was the planned and approved mechanism provided by the Decree for insuring that this Court could exercise its supervisory responsibilities over the actions taken by the parties to remedy the intentional discrimination found in *Wilmore*. Thus, in view of the provisions of *Wilmore*, the City's actions were unnecessary to protect the interests of minority firefighters. However, had action been truly necessary to remedy discrimination, this Court would have countenanced even harsher measures. *See Weber*, 443 U.S. at 200–08, 99 S.Ct. at 2725–29. *See also Bakke*, 438 U.S. at 308, 98 S.Ct. at 2757.

■ This Court has merely treated defendants' actions as what they are—voluntary, race conscious acts not required and not envisioned by the *Wilmore* Consent Decree. Thus, the Court concludes that these actions are not part of a valid affirmative action program, because they are not envisioned by the *Wilmore* Consent Decree, and because they unnecessarily trammel the rights of non-minorities. As a result of the Court's action today, all the parties are in the position they should be in, as contemplated by the *Wilmore* Decree. The City administered a valid promotion test. Candidates for promotion will be ranked according to the procedures originally outlined by the City in General No-

tice 84–3. The *Wilmore* plaintiffs can challenge the 1984 list because of its disparate impact, receiving the benefit of a prima facie case in their favor as outlined in ¶ 16 of the Consent Decree. And, in the event the *Wilmore* plaintiffs bring such an action challenging the promotional list as discriminatory, and a judgment, consent decree, or other remedy is entered in their favor, the resulting remedy would be immune from challenge since neither a bona fide consent decree nor a valid affirmative action program can be the basis of a claim under Title VII. *See Bratton v. City of Detroit,* 704 F.2d 878, 887 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *E.E.O.C. v. McCall Printing Corp.,* 633 F.2d 1232, 1237–38 (6th Cir.1980); *Stotts,* 679 F.2d at 558 (6th Cir.), *rev'd on other grounds,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). This Court's approach will insure the integrity of the remedies provided in the Consent Decree presently and in the foreseeable future, while at the same time protecting the rights of all firefighters employed by the City.[17]

## CONCLUSION

Plaintiffs' Motion for Summary Judgment shall be granted consistent with the Court's Opinion in this case. The City shall not promote any firefighters based on its revised 1984 promotion list. The parties shall submit a Proposed Order outlining a final ranking list compiled in accordance with the Court's Opinion. The defendants' Motion for Summary Judgment is denied.

---

**17.** Also, plaintiffs have moved to consolidate this action with *Wilmore.* D.I. 98. Since the Court's decision today is in no way inconsistent with *Wilmore,* and does not affect any party's rights or obligations under the *Wilmore* Consent Decree, this Motion shall be denied.